**Robert RUMBAUGH, Individually and on behalf of all other shareholders of Beck-Rumbaugh Associates, Inc.,**

**v.**

**Norman H. BECK, Jr., Charles E. Boop; Edward Berry and Beck-Rumbaugh Associates, Inc.**

Civ. A. No. 79–3849.

United States District Court,
E. D. Pennsylvania.

June 13, 1980.

**512**

Fred Lowenschuss, Philadelphia, Pa., for plaintiff.

Thomas J. Feeney, Bala Cynwyd, Pa., for Norman H. Beck and Beck-Rumbaugh Associates, Inc.

Alan C. Kauffman, Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., for Charles E. Boop.

Carmen C. Nasuti, Nasuti & Miller, Philadelphia, Pa., for Edward Berry.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

I. *Preliminary Statement.*

This civil action, embellished with the caption designating it to be a shareholder's derivative action, is in reality a lawsuit between the sole two (2) shareholders of the business entity, Beck-Rumbaugh Associates, Inc. The plaintiff is a 49% shareholder and the defendant Norman H. Beck, Jr. [hereinafter "Beck"] is a 51% shareholder. The defendants Charles E. Boop [hereinafter "Boop"] and Edward Berry [hereinafter "Berry"] appear to be primarily surplusage to the main quarrel between the plaintiff and the defendant Beck. The plaintiff has requested that the Court impose its equitable powers by entering a prohibitory and mandatory preliminary injunction, by ordering the appointment of a receiver or trustee to operate this allegedly beleaguered business entity and by requiring the conduct of an accounting and subsequent distribution of damages. Simply stated, the plaintiff has alleged that the defendants have engaged in a conspiracy to "freeze out" his interests in the entity.

The main quarrel existing between the plaintiff and Beck may be described in an interrogative fashion as how do two (2) persons essentially engaged in a voluntary partnership which has had the misfortune of incorporating successfully terminate their association? The quarrel is compounded by the fact that the plaintiff and Beck were engaged in a personal service business endeavor where goodwill was wholly attributable to the individuals and not to the corporate name. The situation is analogous to the separation of two (2) law partners who had previously joined in practice. As a result of the nature of the business and association, there are limited tangible assets that are capable and accessible for distribution.

When reviewing the allegations, testimony and request for relief, it appeared to the Court that the plaintiff ultimately seeks either a form of reinstatement to the business entity which would entitle him to share in its profits or some sort of liquidation of assets with a distribution according to the percentage of shares of stock held. The defendants collectively in name, but in reality only Beck, assert that the plaintiff voluntarily terminated his association with the endeavor and thus is entitled to neither

reinstatement nor compensatory damages. The dilemma is readily apparent when viewing the contentions of the respective parties in regard to the relief requested. It is quite obvious that there has grown animosity between the plaintiff and Beck and reinstatement of the plaintiff to the endeavor would be similar to forcing one attorney to practice with another who was held in some degree of contempt. In either situation the union would be far from harmonious and the effect certainly deleterious. As regards an award of compensatory damages, problems are equally apparent and confounded. The plaintiff is most definitely opposed to a division of assets limited to those capable of liquidation because they would be of insufficient dollar value. The division must then account for goodwill which, as has already been stated, is attributable not to a corporate shell but solely to individuals comprising that shell. The Court could hardly command the clientele of this business endeavor to collectively procure the services of the plaintiff and Beck according to a 51–49% ratio, nor could it require Beck to continue this corporate shell as a facade for measuring and paying damages. The plaintiff may not receive the value of something not attributable to his labors through the Court's imposition of its equitable powers and, of course, the opposite is equally true.

On the other side of the coin as respects the defendant Beck, it is his hope that his association with the plaintiff will become a matter permanently in the past and quickly forgotten. He has continually asserted an offer of settlement allowing for the distribution of all corporate tangible assets, after which the parties would be allowed to individually pursue their own business endeavors. In essence, Beck offers a clean break of relations permitting each an opportunity to establish his own individual successful business and to court past corporate clients. Impulsively, this appears to be a fair and logical remedy. The only impediment to its adoption are the Articles of Incorporation

and the employment contract executed by the plaintiff. It is difficult to ignore these documents for the sake of expediency and, one might argue, practicality.

The ultimate resolution of this case may prove novel but, fortunately, this decision does not confront the Court today. To be sure, the facts alleged by the parties respectively, evince the feeling that the truth lies somewhere in between.

The plaintiff has alleged that Beck has diverted corporate assets, conspired to affect a "freeze out" and failed to account for corporate profits. The misconducts alleged, therefore, include breach of fiduciary duty, willful and wrongful conversion and corporate mismanagement. The following relief is sought to redress these alleged wrongs:

1. Injunction deleting the plaintiff's name from the corporation; 2. injunction prohibiting the defendant from interfering with the plaintiff's corporate employment; 3. injunction prohibiting the defendants from using corporate assets in nonbusiness related pursuits and mandating reimbursement to the corporation of assets diverted in the past; 4. appointment of a receiver or a trustee; and 5. costs of this action. In addition, the plaintiff ultimately seeks further relief in the nature of an accounting and reimbursement and also, on his own behalf, compensatory damages.

The defendants and particularly Beck again steadfastly contend that the plaintiff resigned his participation in the business endeavor and terminated his employment services in August, 1979. A variety of testimony, documents and corporate actions are proffered in support of this contention.

II. *Findings of Fact.*

1. Beck-Rumbaugh Associates, Inc. is engaged in the office equipment and supply business in the capacity of manufacturers representatives.[1]

2. On June 30, 1976, Beck-Rumbaugh Associates, Inc. was incorporated. The de-

---

1. The defendant Beck had been engaged in this type of business for approximately twenty (20) years under a variety of trade names. The

business endeavors were first labelled sole proprietorships and later partnerships until its final evolution into a corporation.

fendant Beck was named Chairman of the Board, President and Treasurer. The plaintiff was named Vice President and Secretary. The defendant Boop was designated to serve on the Board of Directors.[2]

3. On July 1, 1976, the plaintiff entered into an employment agreement with Beck-Rumbaugh Associates, Inc. Paragraph 8(a) of this agreement provides as follows:

Rumbaugh agrees that for a period ending two years after the termination of his employment with the Company, he will not engage in any business conducted in whole or in part within the City of Philadelphia or within a fifty mile radius thereof which is in general competition with the business of the Company at the time of termination. The term "engage in" shall include, but shall not be limited to, activities, whether direct or indirect, as owner, proprietor, principal, agent, partner, stockholder, officer, director, participant, manager, employee, consultant or lender; provided, however, that the ownership of not more than 3% of a publicly held corporation shall not be included in that term.

4. Paragraph 6 of this agreement provides as follows:

The term of this Agreement shall extend for a period of three (3) years commencing on July 1, 1976 and terminating on June 30, 1979, unless the Company shall have given written notice of its intention to terminate this Agreement as provided in paragraph 7 of this Agreement. At the expiration of such three year term, subject to the provision of paragraph 7 hereof, this Agreement shall continue until either party shall deliver written notice to the other party hereto to the effect that this Agreement shall terminate thirty (30) days from the giving of such notice.

5. In reference to this agreement and its termination date, the plaintiff in May, 1979, first suggested his departure from the corporation to be effective on the termination date of the agreement.

6. Shortly after the May, 1979 meeting, the plaintiff and Beck met to discuss the name and qualification of a person to replace the plaintiff. The plaintiff recommended Douglas Dalton who was employed as a sales representative for Dennison Manufacturing Company.

7. On June 10, 1979, at a convention in Bedford Springs, Pennsylvania, the plaintiff contacted Douglas Dalton to inquire of the latter's availability for possible employment with the company. The plaintiff then advised Douglas Dalton to await contact from the defendant Beck before accepting any other employment.[3]

8. On June 15, 1979, the plaintiff informed the defendant Beck of his intention to disassociate himself from Beck-Rumbaugh Associates, Inc. A termination date of June 30, 1979 was verbally established. The parties further agreed to a reasonable division of profits attributable to corporate profits made during the plaintiff's tenure as well as a form of compensation for the plaintiff's interest in the corporation's tangible assets including a Florida condominium and a limited inventory.

9. The June 15, 1979 meeting concerned another topic of discussion; that is, a "buyout" agreement whereby the plaintiff would be free to leave the corporation's employment and engage in competition as a manufacturer representative. A plan for the distribution of assets was also discussed and there was an "agreement in principle" with respect to the purchase of the plaintiff's stock in the corporation that would

---

**2.** The defendant Berry was identified in the Complaint as the accountant for the corporation. His involvement in this action is limited to the conspiracy allegations as respects his accountant services.

**3.** The defendant Beck contacted Douglas Dalton on approximately June 18, 1979 and a formal meeting was scheduled for a week later at the Georgetown Inn in Washington, D.C. At this meeting, the defendant Beck pointedly stated that the plaintiff was terminating his association with Beck-Rumbaugh Associates, Inc. and an offer of employment was formally made. Douglas Dalton officially came into the employ of Beck-Rumbaugh Associates, Inc. on August 20, 1979.

allow the plaintiff to obtain an acceptable amount for his interest in the business.

10. On July 1, 1979, the plaintiff formally and finally terminated his association with Beck-Rumbaugh Associates, Inc.

11. On July 9, 1979, Richard F. Biborosch met with the plaintiff to discuss the plaintiff's purchase of a life insurance policy taken out for the plaintiff and owned by the corporation.[4]

12. At this meeting, the plaintiff informed Richard F. Biborosch of his departure from Beck-Rumbaugh Associates, Inc. and that he wanted to effect a transfer of ownership of the insurance policy covering his life from the corporation to himself.

13. The plaintiff authorized an absolute assignment of the rights and interests accruing in the insurance policy to himself and designated his wife as primary beneficiary. On July 10, 1979, the defendant Beck provided his concurrence and the assignment was processed.[5]

14. On August 13, 1979, the defendant Beck signed and mailed the following letter to the industry concerning the plaintiff's resignation:

This letter will serve to inform you that Robert H. Rumbaugh has left Beck-Rumbaugh Associates, Inc.

Bob has served this organization effectively and forcefully for the past eight and a half years. His efforts were much appreciated by our sales organization. We all wish him well in his new endeavor.

15. On August 16, 1979, the plaintiff and the defendant Beck met at the Overbrook Country Club at which time the plaintiff informed the defendant Beck that he did not approve of the letter to the industry.

16. On August 28, 1979, Marc B. Slater, Esquire, counsel for the plaintiff at that time, addressed a letter to Albert A. Lindner, Esquire, counsel for Beck-Rumbaugh Associates, Inc., in which he attempted to reduce the terms of the oral "agreement in principle" discussed by the plaintiff and the defendant Beck on June 15, 1979, to writing. Apparent from the terms of Slater's memorialization is a contradiction from the terms as viewed by the defendant Beck.

17. On September 1, 1979, Bruce Sotland, the Eastern Regional Sales Manager for Hallmark Cards, by letter addressed to the defendant Beck, notified Beck-Rumbaugh Associates, Inc. that their contract by which Beck-Rumbaugh Associates, Inc. became the manufacturer representative to Hallmark Cards was cancelled, effective October 1, 1979.

18. During the first week following Labor Day, the plaintiff contacted Douglas Dalton at the latter's company office and informed him that there were a number of invoices and literature at his Moorestown, New Jersey home.

19. On or about September 6, 1979, Douglas Dalton visited at the plaintiff's residence to obtain these company documents and to generally discuss company procedures and customers. The visit was at the plaintiff's invitation and during it he stated that he had disassociated himself with Beck-Rumbaugh Associates, Inc., in order to begin a personal business venture in the manufacturer representative field or, possibly, in another area.

20. On October 1, 1979, the plaintiff was engaged by Hallmark Cards as its manufacturer representative under the trade name of Bob Rumbaugh Associates. The discussion culminating in this oral agreement [6]

---

4. The plaintiff and defendant Beck had heretofore agreed that insurance policies would be procured by the corporation on their lives. These policies were maintained by the corporation to ensure the surviving partner funds necessary to pay for the stock of the deceased partner in accordance with a valuation schedule specifically and solely applicable in circumstances of death.

5. The first premium after the assignment was effected was due on August 12, 1979. The plaintiff made this payment.

6. Bruce Sotland further testified that Hallmark Cards had mailed a contract to the plaintiff but that it was not yet executed. The delay was attributable to the plaintiff's stated desire to redefine the geographical area for which he was responsible.

occurred in August, 1979 after Bruce Sotland had learned that the plaintiff and the defendant Beck had dissolved their association.

21. On October 22, 1979, Albert A. Lindner, Esquire, in his capacity as counsel to Beck-Rumbaugh Associates, Inc., addressed a letter to Bruce Sotland informing him that the retention of the plaintiff as a manufacturer representative was in violation of an agreement between the plaintiff and Beck-Rumbaugh Associates, Inc.

22. The Lindner letter was subsequently referred to Hallmark Card's Legal department and a response followed on November 13, 1979:

> Your letter of October 22, 1979, to Mr. Bruce Sotland was referred to me. Your letter came as a complete surprise and we have no idea of how or why any agreement we may have with Robert Rumbaugh as a manufacturers' representative would be in violation of any agreement between Beck-Rumbaugh Associates. Your letter did not give any specifics or include a copy of any such agreement and, accordingly, we are not in any position to make a judgment as to why we can not contract directly with whom we wish. Please advise immediately as to the details of the situation so that we may make an informed judgment. It sounds as if the dispute is actually between Beck and Rumbaugh and does not and should not involve Hallmark.
>
> *We will do nothing until we hear from you further.* (Emphasis added).

23. On December 14, 1979, at the Preliminary Injunction Hearing, the following colloquy occurred between Bruce Sotland and the plaintiff's counsel after the above letter was introduced into evidence:

> Q  Now, have you or Hallmark received anything further from Attorney Lindner or from Mr. Feeney or anybody representing Mr. Beck or Beck-Rumbaugh Associates, Incorporated?
>
> A  I did.[7]
>
> Q  Do you know if anybody else has received anything at Hallmark?
>
> A  No, sir.[8]

24. On November 27, 1979, Hallmark Cards issued Check No. 167677 in the amount of $843.22 to Bob Rumbaugh Associates. The check represented the amount of commissions owed the plaintiff for services rendered.[9]

25. The company is presently being operated as Beck Associates and represents approximately eleven (11) manufacturers and employs six (6) salespersons.

## III.  Conclusions of Law.

1. Preliminarily, the Court appears to have jurisdiction over this action pursuant to 28 U.S.C. § 1332. The plaintiff is a citizen of the State of New Jersey and the individual defendants are citizens of the Commonwealth of Pennsylvania. The defendant Beck-Rumbaugh Associates, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and with its principal place of business in King of Prussia, Pennsylvania. The amount in controversy exceeds $10,000.00, minus interest and costs.

---

7. The plaintiff's counsel did not pursue this line of questioning further after Bruce Sotland responded that he had indeed received further communications concerning this matter. Presumably, because of the plaintiff's failure to elicit further testimony in this regard and because Hallmark later continued the association with Bob Rumbaugh Associates, the further correspondence received by Bruce Sotland negated the impact and intent of Albert A. Lindner's October 22, 1979 letter. Counsel for the defendant Beck has continually asserted that his client has not requested customers to terminate their dealings with the plaintiff.

8. Notes of Testimony, pp. 3–23.

9. This check has not been negotiated by Bob Rumbaugh Associates and, in fact, was presented at trial. Notably, however, no attempt has been made by the plaintiff to obtain an alternate check designating Beck-Rumbaugh Associates, Inc., as the payee nor has the plaintiff taken steps to correct any misinformation of Hallmark Cards concerning the identity of its manufacturer representative.

2. The evidence adduced is insufficient to warrant the Count's imposition of its equitable powers.

## IV. *Discussion.*

At the onset, the Court deems it necessary to precisely define what is presently before it and what is not. The sole question concerns the imposition of the Court's equitable powers manifested in the form of a preliminary injunction, an accounting and the appointment of a receiver.[10] Despite the fact that the plaintiff attempted to establish his entire case for damages by the introduction of hundreds of corporate checks, the Court will remain focused upon its sole, present obligation. An endeavor to suggest a final or ultimate disposition on the merits of the case may at this time be premature.

### A. *Preliminary Injunction and Accounting.*

■ In order for the plaintiff to prevail on his motion for the imposition of equitable relief, he must meet the burden of establishing four (4) criteria:

(1) That he will be irreparably harmed unless the motion is granted;

(2) The absence of substantial harm to the opposing party if the motion is granted;

(3) The alignment of the public interest in whether or not the injunction is entered; and,

(4) A likelihood that he will prevail on the merits.

*Nelson v. Miller,* 373 F.2d 474, 477 (3d Cir.), *cert. denied,* 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967). In view of the fact that the Court considers the first barrier unhurdled, the remaining three (3) criteria will not be discussed in any great length, if at all.

■ "[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternative reme-dy in the form of money damages." 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2948, p. 434. If redress for an alleged wrong is capable of being measured in money damages and a fund assuredly will exist for the satisfaction of any ensuing damage award, no irreparable harm exists. It is a well-established principle that monetary loss alone does not constitute that kind of injury essential to the granting of a preliminary injunction. *Tele-Controls, Inc. v. Ford Industries, Inc.,* 388 F.2d 48 (7th Cir. 1967); *Salsburg's Meats, Inc. v. Shultz,* 363 F.Supp. 269 (E.D.Pa. 1973); *Radio Hanover, Inc. v. United Utilities,* 273 F.Supp. 709 (M.D.Pa.1957).

In the present case, the plaintiff claims as harm to himself the loss of economic rewards resultant from the disassociation with Beck-Rumbaugh Associates, Inc. From the face of the allegations in the complaint, it is readily apparent that the sole injury claimed is a financial one and that the remedies pursued emphasize the plaintiff's desire merely to be placed in a position where such financial gains may again accrue. To be sure, the plaintiff suffers some degree of detriment or economic hardship as a result of his foreclosure from company participation and distribution of profits. However, in order to prevail in gaining preliminary relief, more than the deterioration of one's relative position must be established. *See Sanders v. Air Line Pilots Ass'n, Int'l,* 473 F.2d 244 (2d Cir. 1972).

The case of *A.L.K. Corporation v. Columbia Pictures Industries, Inc.,* 440 F.2d 761 (3d Cir. 1971) offers the Court considerable guidance in addition to the case precedents already cited. Factually and procedurally, the Court of Appeals was confronted with an appeal from a district court granting a plaintiff's motion for preliminary injunction. The injunction prohibited the defendant from licensing or contracting to license a motion picture entitled "Husbands" at

---

**10.** The plaintiff had filed a motion on January 10, 1980, bearing the caption "Motion For Order To Maintain Parties In Position Of Status Quo." Because this motion seeks the same form of relief requested in the plaintiff's Motion For Preliminary Injunction it may be and is considered subsumed.

any Philadelphia area theatre other than that owned by the plaintiff. The district court had found that the defendant had no right to terminate a licensing agreement between it and the plaintiff and enjoined the defendant from soliciting new bids from other theatres. It was concluded that the plaintiff would suffer from an intangible loss of goodwill and business momentum and thus be irreparably harmed. The Court of Appeals reversed this ruling and adopted the following standards for its ensuing reasoning:

> Generally speaking a breach of contract results in irreparable injury warranting equitable relief in two types of cases:
>
> "1. Where the subject-matter of the contract is of such a special nature, or of such a peculiar value, that the damages, when ascertained according to legal rules, would not be a just and reasonable substitute for or representative of that subject matter in the hands of the party who is entitled to its benefits; or in other words, where the damages are inadequate;
>
> 2. Where, from some special and practical features or incidents of the contract inhering either in its subject matter, in its terms, or in the relations of the parties, it is impossible to arrive at a legal measure of damages at all, or at least with any degree of certainty, so that no real compensation can be obtained by means of an action at law; or in other words, where damages are impractical." (Emphasis added).

A.L.K. Corporation v. Columbia Pictures Industries, Inc., supra at 753. (Citations omitted). It held that the subject matter of the contract was not of such a peculiar nature so as to preclude valuation and that the plaintiff's loss of income could be measured in damages to a sufficient degree of certainty. No irreparable harm, therefore, was deemed to exist. See also Tele-Controls, Inc. v. Ford Industries, Inc., supra.

■ Should the plaintiff in the present case prevail on the merits, his damages will be susceptible to valuation and ascertainable in amount to a sufficient degree of certainty. Moreover, any judgment obtained would be capable of immediate satisfaction. Beck-Rumbaugh Associates, Inc. or Beck Associates, the name under which the business presently operates, is a continuing endeavor. It presently is engaged as a manufacturer representative by eleven (11) companies and it employs six (6) salespersons to ensure the effective discharge of its duties and obligations in these capacities.[11]

■ Although the Court views the above recital dispositive of the issues created by the plaintiff's request for preliminary injunctive relief, one area worthy of comment arises from the facts of the case. The plaintiff's employment contract contained a covenant not to compete which essentially provided that if and when the employment contract was terminated the plaintiff would be prohibited from engaging in any business in general competition with the company within a fifty (50) mile radius of the City of Philadelphia for a period of two (2) years.[12] A few cases have considered the concept that an eventual award of money damages may not be sufficient compensation for a forced withdrawal from one's

11. Although the Court considers this action more a personal suit by the plaintiff as opposed to a derivative action, comment is necessary on the latter feature. The present flourishing existence of the business or corporate entity—only the Hallmark Cards account was lost as a result of the disassociation of the plaintiff—precludes a finding that it is suffering irreparable harm as a result of the wrong alleged or even that any harm has resulted at all. To be sure, the defendant Beck's management of the entity has not in the past arisen to angelic proportions but neither is there firm evidence of record to suggest some future liability or culpability. In short, the Court does not deem the plaintiff's likelihood of success as regards his many attempts to establish illegal corporate activity of a sufficient magnitude to warrant the imposition of a preliminary injunction. Furthermore, there is some doubt whether the plaintiff is in a position to assert claims on behalf of the corporation in view of the defendant's assertions of unclean hands and estoppel. This doubt need not be resolved at present.

12. The employment contract referred to provided a termination date of June 30, 1979 and specified that "this Agreement shall continue until either party shall deliver written notice to the other party. . . . "

livelihood when granting requests for the imposition of preliminary injunctive relief.

In *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197 (2d Cir. 1970) the court was confronted with a motion for a preliminary injunction. The plaintiff had been a franchised dealer of the defendant for approximately twenty (20) years and he sought to enjoin the defendant from terminating his dealership and contacting his former customers. In permitting the imposition of injunctive relief, the court stated:

> Ford's contention that Semmes failed to show irreparable injury from termination is wholly unpersuasive. Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award.

*Semmes Motors, Inc. v. Ford Motor Company, supra* at 1205. A similar sentiment could be posited to the present case. However, two (2) features strongly militate against it.

In the *Semmes* decision, the Court of Appeals for the Second Circuit relied heavily upon the principle that the propriety of issuing preliminary injunctions should initially be scrutinized by balancing the hardships of the respective parties. If an imbalance tipped toward the plaintiff it would be necessary that he only raise questions going to the merits of a serious and doubtful nature. *See Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953). In the present case, the facts evince no serious imbalance of hardship.

In the first instance, the parties in the present case are not in such an unequal status as existed in *Semmes*. The company can hardly be likened to a Ford Motor Company and, it must be emphasized, was in essence merely a two-man enterprise consisting of the plaintiff and the defendant Beck. This fact alone militates against any analogy with the application of *Semmes*.

The court would be remiss, however, if it did not recognize that the plaintiff's burdens are presently greater than those of the defendant Beck. The simple fact of the matter is that the defendant Beck continues his operations and receives remuneration while the plaintiff does not. But these burdens cannot arise to the type of hardships envisioned in *Semmes*. The nature of the business pursued by the parties is one of personal service and not limited to the sale of one particular brand of merchandise. The plaintiff may thus improve his position by merely plying his wares in the same or other types of markets.[13] As regards the hardships that would accrue to the company should the plaintiff be awarded damages according to the company's tangible assets and entire goodwill or be reinstated, the Court considers them of sufficient magnitude to neutralize those presented on behalf of the plaintiff. In the first instance, a damage award may well improperly reflect the measure of goodwill attributable to the plaintiff or the defendant Beck. In the second instance—that of reinstatement—the company would be required to maintain another salesperson in its staff of six (6) and, more importantly, would appear unstable and unprofessional to remaining customers thereby affecting goodwill.[14]

More important to the Court's consideration is the lack of any practical effect of the

---

**13.** Notably, the plaintiff had begun his own manufacturer representative enterprise and had solicited the Hallmark Cards account. Whether he was equally successful in procuring other accounts is a matter of which the Court is unaware.

Whether the plaintiff is limited to markets other than those involving a manufacturer representative is discussed in note 16 and accompanying text *infra*.

**14.** The hardships cursorily considered have been balanced in a vacuum devoid of any imposition of fault upon either of the parties. If it were within the Court's review and capability to make a judgment on the merits, of course, there would be no need to make a balancing. The imbalance would naturally tip toward the party declared faultless.

covenant not to compete. As earlier noted, the company has not continued its attempt to enforce it as evidence by the acceptance of the plaintiff's representation of Hallmark Cards. Moreover, the defendant Beck has continually asserted his belief that the parties have terminated their association and are free to pursue their own endeavors and successes.[15] Finally, it is noted that this chameleon-like company has changed its structure in accordance with changes in its environment. The misfortune of incorporating this personal service business endeavor and executing employment contracts should not, in reality, impair the utilization of a logical and practical interim position.[16]

### B. Appointment of a Receiver.

■ In addition to his request for a preliminary injunction, the plaintiff has moved the Court to appoint a receiver to operate the company. The philosophy guiding the decision upon such a motion is expressed as follows:

> The appointment of a receiver is a matter *within the sound discretion of the court,* and each case must be determined upon its own conditions and circumstances, and in exercising this right the courts should ever keep in mind that a receiver is, *like an injunction, an extraordinary remedy, and ought never be made except in cases of necessity, and upon a clear and satisfactory showing that the emergency exists, in order to protect the interests of the plaintiff in the property involved.* The power of appointing receivers is one which the courts have said should be

*sparingly exercised, and with great caution and circumspection.* (Emphasis added).

*Miller v. Fisco, Inc.,* 376 F.Supp. 468, 470 (E.D.Pa.1974). *See also Mintzer v. Arthur L. Wright & Co.,* 263 F.2d 823 (3d Cir. 1959). The appointment of a receiver is thus a drastic and extraordinary remedy and is to be used only in exceptional circumstances. *See Maxwell v. Enterprise Wall Paper Mfg. Co.,* 131 F.2d 400 (3d Cir. 1942).

The appointment of a receiver in situations where a corporation is being grossly mismanaged or its assets wrongfully diverted is, naturally, not unprecedented. *See, e. g., Tanzer v. Huffines,* 408 F.2d 42 (3d Cir. 1969); *Coskery v. Roberts & Mander Corp.,* 97 F.Supp. 14 (E.D.Pa.1951). The burden required to be met, however, has limited the number of times this relief has been provided. Essentially, that burden is a heavy one which requires a clear showing that an emergency exists. *Petersen v. Federated Development Co.,* 387 F.Supp. 355 (S.D.N.Y. 1974). In addition, courts have also emphasized the likelihood-of-success test, *Bookout v. First National Mortgage & Discount Co., Inc.,* 514 F.2d 757 (5th Cir. 1975), and whether greater harm would result from the appointment than if no appointment were made. *S.E.C. v. Heritage Trust Co.,* 402 F.Supp. 744 (D.Ariz.1975).

■ In the present case, the plaintiff has not adduced sufficient facts clearly suggesting that an emergency exists nor has he satisfactorily displayed a likelihood of success. The defendant Beck has continued

---

**15.** The Court does not necessarily adopt the defendant Beck's belief of the status of the parties but does recognize its importance concerning the continued viability of the employment contract and, specifically, the covenant not to compete.

**16.** The Court's reference to this as an "interim position" is made in view of its ruling to expedite proceedings. *See* Section IV.C. *infra.*

The facts of this case and the nature of the company and its past and present characters suggest an abandonment of the employment contract. In *Trustees of First Presbyterian Church of Pittsburgh v. Oliver-Tyrone Corp.,* 248 Pa.Super. 470, 476, 375 A.2d 193, 196 (1977), the court stated:

> It has long been the law in our Commonwealth that it is competent for the parties to a written contract to show that it was subsequently abandoned in whole or in part, modified, changed or a new one substituted, either by writings or by words or by conduct or by all three. (Citations omitted.)

The surrender of mutual rights qualifies as sufficient consideration, *Kirk v. Brentwood Manor Homes, Inc.,* 191 Pa.Super. 488, 159 A.2d 48 (1960), and, most importantly to the facts of the present case, the abandonment may be inferred from acts or conduct of the parties inconsistent with an original contract. *See Muchow v. Schaffner,* 180 Pa.Super. 413, 119 A.2d 568 (1956).

the operation of the company in an apparently successful manner. Although the plaintiff has alleged a variety of corporate wrongdoings, the proofs offered in support of the allegations fall far short of establishing their existence.[17] More importantly and in light of the successful manner in which the company is presently being run, the Court perceives an appointment of a receiver to be potentially more harmful than if one were not implanted. The company is essentially a personal service endeavor and when the fact of its being placed in receivership became public knowledge clientele may well be deterred. The result, of course, would be a future diminishment of income and profits.

### C. *Expedited Trial.*

The facts of this case present novel questions of potential dissolution and remedial measures. The nature of the company and the respective positions of the parties suggest the desirability of an early resolution. In view of the fact that discovery is nearly completed, if not already completed, as a result of the parties' preparation for these hearings, the Court envisions an early trial date and tentatively lists September 15, 1980, as that date. Of course, an expedited trial date militates against the need of imposing preliminary injunctive relief. *See Volk v. Loew's, Inc.,* 94 F.Supp. 162 (D.Minn.1950).[18]

---

**17.** In *Beckerman v. Sands,* 364 F.Supp. 1197 (S.D.N.Y.1973), a derivative action involving an allegation of diversion of corporate assets, the court denied the plaintiff's Motion For Appointment Of A Receiver, in part, because they had failed to clearly and sufficiently establish the substance of their allegations. The court concluded that the defendant would be available to be held accountable at a later date if the allegations were established. *See also Miller v. Fisco, Inc.,* 376 F.Supp. 468 (E.D.Pa.1974).

**18.** During the course of the preliminary injunction hearing, very little evidence, if any at all, was presented against the defendants Boop and Berry. Therefore, at this stage, the Court is unsure of their involvement in the future proceedings of this case. The Court will, of course, entertain motions of dismissal made on their behalf and any memorandum of law in opposition to their dismissal as may be filed.