**ARTHUR TREACHER'S FISH & CHIPS, INC.**

v.

**A&B MANAGEMENT CORPORATION**

v.

**MRS. PAUL'S KITCHENS, INC.**

Civ. A. No. 80–3378.
No. MDL 467.

United States District Court,
E. D. Pennsylvania.

Aug. 3, 1981.

John M. Elliott, John F. Stoviak, Edward F. Mannino, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for plaintiff and third party defendant.

Franklin Poul, Judith R. Cohn, Brian P. Flaherty, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, DISCUSSION AND ORDER

HANNUM, District Judge.

### I. *Introduction*

Arthur Treacher's Fish & Chips, Inc. ("ATFC") has brought suit against A&B Management Corporation ("A&B") under the Lanham Trade-Mark Act, 15 U.S.C. §§ 1051–1127 ("Lanham Act"). A&B answered and counterclaimed alleging, *inter alia*, breach of contract and antitrust violations on the part of plaintiff, ATFC, and third-party defendant, referred to as additional defendant by the parties in their pleadings, Mrs. Paul's Kitchens, Inc. ("MPK"). Thus commenced a battle between a franchisor (ATFC) and one of its franchisees (A&B). Figuratively, this "battle" was to be the first in what has evolved into, by analogy, "war". The last count revealed twelve ATFC cases which have been transferred to this Court by the Judicial Panel on Multidistrict Litigation.

This opinion will focus upon and resolve cross motions for preliminary injunctive relief filed by ATFC and A&B. ATFC seeks a preliminary injunction ordering A&B to "remove all Arthur Treacher's signs and other identifying characteristics from its stores, and any goods, materials or products in its possession, custody or control" and further, enjoining A&B "from infringing upon Arthur Treacher's Fish & Chips, Inc.'s trademarks in the future."

A&B seeks a preliminary injunction enjoining ATFC and MPK from:

(1) continuing to violate the antitrust laws and continuing to breach their duties to A&B resulting from the unlawful tying arrangements and other unreasonable restrictions on franchisees' sources of supply for food products im-

posed by them; (2) terminating A&B's franchise; (3) preventing distributors and suppliers from supplying A&B with products necessary to the operation of its franchise, or otherwise interfering with such supply; and (4) attempting to collect franchise fees from A&B.

An extensive hearing on these motions was conducted and extensive briefs have been filed resulting in a record consisting of several thousand pages. Oral argument was also heard at the request of the parties. The lines have thus been drawn in this preliminary skirmish. After thorough consideration of the record adduced, and in accordance with Fed.R.Civ.P. 52(a) and 65(d), the Court renders the following:

## II. *Findings of Fact*

1. Plaintiff, Arthur Treacher's Fish & Chips, Inc. ("ATFC") is a Delaware corporation with its principal place of business in Pennsylvania.

2. ATFC is a wholly owned subsidiary of Mrs. Paul's Kitchens, Inc. ("MPK"), having been acquired by MPK on November 21, 1979.

3. ATFC is engaged in the business of owning and operating Arthur Treacher's Fish & Chips restaurants, and is also engaged in the business of licensing others, in return for a commission or royalty, to own and operate Arthur Treacher's restaurants. These restaurants are "fast food" outlets specializing in seafood. ATFC income is derived from the company owned stores, licensee fees and royalty income with a great portion of this income derived from the latter source.

4. Beginning in 1969, ATFC has registered various trademarks with the United States Patent and Trademark Office pursuant to the Lanham Act, including the name "Arthur Treacher's Fish & Chips" and various other logos used in the business. These registered trademarks remain valid today.

5. Defendant, A&B Management Corporation ("A&B") was formed in 1974 for the purpose of operating an ATFC franchise.

6. On November 22, 1974, A&B entered into a Master License Contract with ATFC which granted A&B the exclusive right to operate Arthur Treacher's Restaurants in the city and county of Philadelphia. A&B purchased this franchise for $100,000.

7. Pursuant to the Master License Contract, A&B opened and now operates seven Arthur Treacher's Restaurants in the Philadelphia area. The total investment made by A&B in opening these seven outlets is approximately $3,000,000. The most recent restaurant opened by A&B costs in excess of $600,000 and was completed in May, 1980. This last restaurant was opened with the approval and support of ATFC.

8. For each of these outlets, A&B entered into a Standard Unit License Contract. These contracts granted to A&B the right to use the various registered trademarks of ATFC. In return for the permission to use the ATFC trademarks, A&B agreed to pay royalties equal to the greater of $500 or 5% of monthly gross receipts. Although the original contract between ATFC and A&B provided for a 5% payment of royalties, since approximately March, 1979, A&B was paying royalties on a 4% basis which is what they are being charged at the present time.

9. In addition to the 5% of monthly gross receipts payable to ATFC, A&B agreed to pay a sum equal to not less than 3% of annual gross receipts to a cooperative advertising organization known as the "Philadelphia Metro" which was established by ATFC for the purpose of advertising in the Philadelphia Metropolitan area.

10. To date, A&B has contributed approximately $300,000 to the Philadelphia Metro for advertising and is still contributing 3% of its annual gross receipts to the organization for advertising. This money is spent primarily to purchase "air time" on television.

11. Although other franchisees in addition to A&B are present in the Philadelphia metropolitan area (which for purposes of the television advertising includes Bucks, Chester, Delaware and Montgomery counties and parts of Southern New Jersey and the state of Delaware) A&B has been pri-

marily responsible in the past several years for the advertising done in these areas by the Philadelphia Metro. A&B has contributed 34%, 56% and 66% of the total contributions to the Philadelphia Metro for the years 1979, 1980 and 1981, respectively.

12. In addition to the $300,000 of contributions by A&B to the Philadelphia Metro for advertising to date, A&B has paid ATFC approximately $400,000 in royalties.

13. However, unlike the 3% advertising payment which A&B continues to make, since September, 1979, A&B has not paid any royalties to ATFC. The amount of royalties accruing to date since September, 1979, which A&B has withheld, is approximately $200,000.

14. On July 11, 1980, ATFC gave A&B written notice of a then existing delinquency in the amount of $52,413.53 of unpaid royalties. The notification related an expectation on the part of ATFC that A&B would make prompt arrangement for payment of the outstanding amount.

15. A&B did not pay the outstanding amount and on August 15, 1980, ATFC mailed to A&B a notice that A&B's license to use the Arthur Treacher's trademarks, service marks, processes, etc., was terminated. The notice further advised A&B that it should cease using the Arthur Treacher's signs and that it should remove all distinguishing characteristics identifying it as an ATFC restaurant from its premises.

16. Despite this notice of termination, A&B continues to use the trademarks, service marks, processes, etc. of ATFC and is not paying for them. This suit was instituted on August 27, 1980 by ATFC seeking, *inter alia,* payment of the withheld royalties and injunctive relief preventing A&B from using the Arthur Treacher's trademarks and compelling A&B to remove all identifying characteristics of Arthur Treacher's from its seven restaurants.

17. A&B is owned in part by Agostine Malerba. Mr. Malerba is also president of A&B and is in active charge of its daily operations.

18. Mr. Malerba was considered to be an outstanding franchisee by the management of ATFC, both before and after the acquisition of ATFC by MPK. He can easily be characterized as a model franchisee. In 1978, Mr. Malerba received awards from ATFC for the best run store, the best multiunit operator, the highest volume store, and the highest volume multiunit operator in the country.

19. In addition to the substantial amounts of money invested by Mr. Malerba as head of A&B, he has also invested substantial amounts of time, both in the running of his seven outlets and in the ATFC system as a whole. Since A&B opened its first store in 1975, Mr. Malerba has worked in excess of 100 hours per week operating his stores. Since 1975, he has worked in his capacity as head of A&B continually. In addition, Mr. Malerba has on occasion performed services for the ATFC system as a whole, benefitting company stores (those restaurants owned and operated directly by ATFC) and other franchises, as well as benefitting the A&B operation.

20. MPK acquired ATFC on November 21, 1979 by "purchasing" all of the outstanding common stock of ATFC in an "acquisition and reorganization" transaction which can basically be summarized as follows: Orange Company, the previous owner of ATFC, exchanged its common stock in ATFC for a new issue of preferred stock and a long-term promissory note. The preferred stock had a face value of $5,500,000 and the note was in the amount of $3,500,000. MPK then acquired the intercompany debt between Orange Company and ATFC—the Orange Company advances to ATFC—for $5,000,000. This intercompany debt—MPK's right to receive payments from ATFC for previous advances made to ATFC by Orange Company—was exchanged by MPK in return for all of the outstanding common stock of ATFC thus making it a wholly owned subsidiary of MPK as of November 21, 1979. The book value of the net assets of ATFC exceeded the consideration paid for the company by approximately $6,000,000. In effect, MPK paid $5,000,000 for a company with net assets of approximately $11,000,000.

21. MPK has made no further investments in ATFC other than the $5,000,000 paid to Orange Company. MPK has, however, guaranteed loans made to ATFC in the amount of $10,000,000 and has, over a period of time, advanced merchandise to ATFC on an accounts receivable basis in the amount of $3,000,000.

22. These loans were needed by ATFC to continue its operations due to the fact that it has not been receiving royalty payments from the franchisees, the total arrearage to date being in excess of $12,000,000, computed on a 4% basis. These royalties are the "lifeblood" of a franchise system and ATFC cannot exist without these royalties.

23. The essence of a successful franchising system is the existence of a cooperative effort mutually beneficial to the franchisor and its franchisees. One of the primary purposes of this cooperative effort is to create and maintain a uniform image which is designed to promote goodwill throughout the system.

24. Systemwide use of high quality and uniform products and processes is crucial to the maintenance of an image which will successfully promote goodwill. The Standard Unit License Contracts, in Article III, recognizes this basic business precept by requiring the licensees, such as A&B, to conform to Arthur Treacher's specifications as to uniformity of products, containers, uniforms, equipment, supplies and buildings.

25. Recognizing that a franchising system is a cooperative venture—a "two-way street"—ATFC obligated itself to provide services to the franchisees in connection with the maintenance of this uniformly beneficial image. These services or duties on the part of ATFC include allowing the licensees, such as A&B, to use the trademarks, service marks, patents, and trade secrets of ATFC; using its best efforts to protect those trademarks, service marks, patents and trade secrets from infringement; supplying products through distributors for use in the restaurants; approving the products, equipment and miscellaneous supplies used in the restaurants; recommending brands and manufacturers of items and wholesale sources from which to obtain those items; providing training courses; researching the potential development of new products; assist in the opening of licensee restaurants; providing manuals which outline procedures for use in operating the restaurants; providing report forms for use by the licensee in reporting to ATFC; and generally providing advice and assistance to the licensee.

26. In addition to the specifically enumerated contractual services which ATFC is obligated to provide, ATFC has in the past provided quality assurance and marketing services designed to create and maintain a uniform image among all the franchisees.

27. ATFC executives, including the Chairman of the Board, have recognized an obligation to provide these quality assurance and marketing services.

28. When MPK acquired ATFC, some of the services which ATFC, as a franchisor, was obligated to provide to its franchisees were not being provided. The level of services had been steadily declining for some time prior to November of 1979, when MPK purchased ATFC.

29. The dimunition in services, coupled with a perception on the part of Mr. Malerba that ATFC no longer cared about its licensees or its own restaurants, prompted A&B to begin to withhold the royalty payments. Although the decline in services prompted the withholding of royalties, plaintiff needs the income derived from the royalty payments if it is to effectively upgrade the services.

30. MPK was aware of the overall poor condition of ATFC when it acquired the company, including the fact that many of the franchisees were withholding royalties. MPK was additionally aware of the fact that significant amounts of capital would have to be made available to ATFC if the company were to be rejuvenated.

31. In December, 1979, within two weeks after MPK acquired ATFC, the distributors of ATFC were notified by MPK

that Coldwater Seafood Corporation ("Coldwater") was suspended as a supplier of fish to the Arthur Treacher's system. Several weeks later, Iceland Seafood Corporation, also referred to as "Samband," was also suspended as a supplier of fish to the Arthur Treacher's system.

32. Coldwater and Samband are suppliers of "Icelandic cod." Icelandic cod refers to a species of cod sourced from the waters surrounding Iceland. Icelandic cod is universally regarded in the fish industry to be of better quality than all other types of cod. The reputation of the Arthur Treacher's system has been built upon the use of Icelandic cod with Coldwater and Samband being the traditional suppliers of this fish to the Arthur Treacher's system. There are no other suppliers of Icelandic cod other than Coldwater and Samband.

33. When Coldwater and Samband were terminated as suppliers of fish to the Arthur Treacher's system, the alternative supplier became a company called Fishery Products. The supply of fish provided by Fishery Products—Canadian cod—was inferior in quality to that which had previously been supplied by Coldwater and Samband—the Icelandic cod. In addition, Fishery Products experienced difficulties in supplying the quantities of fish which had previously been supplied by Coldwater and Samband.

34. The reason asserted by the plaintiff, ATFC, for the termination of Samband and Coldwater was the intention on the part of those companies to include "napes" and "belly flaps," undesirable parts of cod fillets, in the future shipments of cod blocks to ATFC distributors. Although the evidence is contradictory on this issue, the weight of the evidence and the demeanor of the witnesses from whom the evidence was sourced, has convinced the Court that plaintiff's asserted reason for the termination of Coldwater and Samband is not supportable. On the contrary, the weight of the evidence points to a finding that these companies were terminated due to a desire on the part of MPK, specifically Edward J. Piszek, Sr., to become the supplier of fish for the Ar-

thur Treacher's system, coupled with a general undefined displeasure and dissatisfaction with these companies on the part of Mr. Piszek emanating from past experience.

35. Shortly after the termination of Coldwater, a meeting was held in December, 1979, between several franchisees and representatives of Arthur Treacher's. Present at that meeting were, among others, Mr. Malerba and Edward J. Piszek, Sr. At that meeting, Mr. Piszek expressed his displeasure at the franchisees for questioning his judgment concerning the type of fish to be utilized in the Arthur Treacher's system and advised the franchisees that one of the major problems with the Arthur Treacher's system was their lack of expertise in purchasing. Mr. Piszek's view was that the franchisees did not know how to "buy right," that there was no reason to use "Cadillacs," referring to the higher quality and more expensive Icelandic cod, when "Chevrolets" would suffice, referring to the less expensive types of fish such as pollack. Mr. Piszek advised the franchisees at that meeting that he had a joint venture with the Polish fishing fleet and that MPK was prepared to become the source of supply of Arthur Treacher's fish items and that MPK was prepared to show the franchisees how to purchase properly. Several of the franchisees, including Mr. Malerba, took exception to the suggestion of Mr. Piszek that MPK supply the products and handle the purchasing for the franchisees.

36. Following the termination of Samband, a second meeting between representatives of the franchisees and executives of MPK and ATFC was held. This meeting, which occurred in January, 1980, was arranged at the request of Richard A. Benefield, one of the franchisees, so that the franchisees could express their concern over the termination of both Icelandic cod suppliers and also to discuss what the franchisees perceived to be a lack of services emanating from ATFC. At this second meeting, Mr. Piszek reiterated the views expressed at the first meeting and again suggested that MPK was prepared to supply the ATFC system with all the products it needed.

37. For a short period of time following the termination of Coldwater and Samband, MPK authorized ATFC to instruct some distributors to buy all of their fish from MPK.

38. A&B has never used any of MPK's products in its stores.

39. The Icelandic cod suppliers were subsequently reinstated as suppliers of fish to the ATFC system.

40. Approximately two to three years ago, prior to the acquisition of ATFC by MPK in November, 1979, MPK entered into a joint venture with the Polish fishing fleet which was called "Mrs. Paul's International" ("MPI"). MPK owned fifty-one (51%) percent of this joint venture, whereby it imports large amounts of fish, ranging in quantities from 3,000,000 to 20,000,000 pounds per year.

41. In September, 1979, prior to the acquisition of ATFC by MPK, MPK submitted samples of fish to ATFC for evaluation in contemplation of supplying ATFC with fish. These samples were rejected because, in the view of the ATFC Director of Quality Assurance and Product Development, the fish submitted by MPK needed improvement and modifications before being considered by ATFC.

42. It was the "dream" of Edward J. Piszek, Sr. to utilize the fish obtained from the Polish fishing fleet via MPI as the source of supply for the Arthur Treacher's system.

43. The destruction as a business entity of Arthur Treacher's, the franchisor, would result in the destruction of the franchisees and vice versa.[1]

III. *Conclusions of Law*

1. This Court has jurisdiction of the matter.

2. Plaintiff, Arthur Treacher's, is entitled to preliminary injunctive relief as molded and conditioned in accordance with the attached discussion.

3. Defendant, A&B Management Corporation, is not entitled to preliminary injunctive relief.

IV. *Discussion*

■ The availability of preliminary injunctive relief depends upon four criteria:

(1) Irreparable harm to the movant absent the injunction;

(2) A likelihood that the movant will ultimately prevail on the merits;

(3) Lack of substantial harm to other interested parties if the motion is granted; and

(4) Lack of substantial harm to the public interest.

*Nelson v. Miller*, 373 F.2d 474, 477 (3d Cir.), *cert. denied*, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967); *Rumbaugh v. Beck*, 491 F.Supp. 511, 517 (E.D.Pa.1980), *aff'd* 636 F.2d 1210 (3d Cir. 1980). Thus, in order to grant preliminary injunctive relief, the Court must be satisfied that, absent the relief, the moving party will suffer irreparable harm pendente lite and that the movant has demonstrated a reasonable probability of success on the merits. Also relevant to the decision is the amount of harm, if any, to the opposing party and other interested persons as well as any harm which might accrue to the public interest. *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–357 (3d Cir. 1980).

---

1. The Findings of Fact are obviously not an exhaustive recitation of the facts adduced at the hearing, nor are they meant to be. For purposes of these motions and as a factual context reflecting the present posture of this dispute and dictating, in the Court's view, the result reached, they are sufficient, we believe.

In connection with certain proposed findings, the parties argued and briefed the admissibility into evidence as an exhibit a Bench Opinion issued March 11, 1981 by the Honorable Clarence C. Newcomer in *Kenneth L. Horstmyer and Madeleine S. Horstmyer v. Arthur Treach-* er's Fish & Chips, Inc. and Mrs. Paul's Kitchens, Inc., C.A. No. 80–3443. Defendant sought its admission into evidence while plaintiff opposed it. The Court considered it unnecessary to go outside the present record to rely on any of the findings rendered by Judge Newcomer and thus this issue, for the time being, is *moot*. At the time of trial, defendant may wish to renew its argument for any potential collateral estoppel effect which Judge Newcomer's opinion may have on this case, and if need be, the Court will dispose of such argument at that time.

A decision on an application for this equitable relief requires a "delicate balancing" of the above criteria. *United States Steel Corp. v. Fraternal Ass'n of Steelhaulers*, 431 F.2d 1046, 1048 (3d Cir. 1970). With these well settled principles in mind, the Court turns its attention to the motions.

The relief prayed for in Arthur Treacher's application consists of an order that A&B "immediately remove all Arthur Treacher's signs and other identifying characteristics from its stores, and any goods, materials or products in its possession, custody or control; and restraining and enjoining A&B from infringing on plaintiff's trademarks in the future." A "delicate balancing" of the factors pertinent to the Court's decision leads the Court to conclude that this application, *as prayed for*, must be denied.

The broad equitable relief sought in plaintiff's motion would, if granted, effectively wipe out defendant's business as an Arthur Treacher's franchisee. Neither the factual record adduced nor the applicable law warrant this drastic alteration of the present status quo. Granting the relief as prayed for in the motion would not benefit either side and, in fact, would severely harm both. Plaintiff would lose the goodwill and the potential for future income derived from one of its best franchisees. Defendant would lose a business which has absorbed a considerable amount of time and money in its development. If this result were to obtain in the other Arthur Treacher's cases in which preliminary injunction motions are pending, assuming that the facts in the other cases do not significantly vary, then the result could well be the beginning of the end for the entire Arthur Treacher's system. This relief the Court, sitting in an equitable capacity, cannot order. However, notwithstanding the broad equitable relief prayed for in plaintiff's motion, it has become evident throughout these proceedings that the obvious crux of plaintiff's application is the fact that A&B continues to use the trademarks of Arthur Treacher's without paying for them, and the real relief plaintiff seeks is the payment of these royalties. In fact, at the oral argument on these motions, held on July 17, 1981, plaintiff's counsel several times made explicitly clear what has been evident throughout these proceedings:

> "They may pursue—they can have their antitrust day, but we have to have an Arthur Treacher's system intact and we cannot provide a system, we cannot protect our trademarks, if we do not have these royalties paid."

Transcript of Oral Argument at 10.

> "I respectfully suggest to you that a lot of what you heard can be abated merely by the payment of the royalties."

*Id.* at 11.

> "The royalties were described—and it is uncontested—is our main source of income. They are the lifeblood of the franchise system.
>
> I suggest respectfully that when we balance the equities here there is certainly no irreparable harm to A&B.
>
> As a matter of fact, Mr. Malerba did not once say that he could not afford to pay the royalties. He said, 'I won't pay the royalties,' but he didn't say, 'I can't pay the royalties.' "

And I think that if he pays the royalties, if it is ultimately determined that he has a—a monetary defense to the payment of royalties, he can get his money back, but there is nobody who can resuscitate a system when you have a system that has a synergistic economic effect that whether you are a franchisee in Florida, you are a franchisee in New England, you are a franchisee in Pennsylvania, you need to protect the integrity of the trademark, you need to protect the viability of the quality-control system and the quality-control services and all the other things that the royalties pay for."

*Id.* at 13.

> "I respectfully point out to the Court that the franchisees must pay the royalties as their share of protecting the trademark."

*Id.* at 15.

> "I think that the mother of the law is justice and the very basic justice that literally cries for resolution in this situa-

tion is to have these royalties paid so that our trademarks can stay viable instead of having an entire system be destroyed." *Id.* at 16.

"... I respectfully suggest to the Court the most equitable way we can proceed is to have them pay the royalties and that— that if they are ultimately right—because I don't think they will be—but if they are ultimately right, then they can recover monetary damages, but you cannot refuse to pay the royalties and convert that into specious irreparable harm that will—that will take down an entire system."

*Id.* at 25. Finally, toward the conclusion of his rebuttal argument, plaintiff's counsel in two sentences stated the capsulated position of Arthur Treacher's with regard to the relief sought:

"Arthur Treacher's—I want to be very clear, and we have been—Arthur Treacher's does not want to put Mr. Malerba out of business. Arthur Treacher's wants Mr. Malerba to pay his contractually mandated royalties."

*Id.* at 45.

Although the Court considers the relief as prayed for in plaintiff's Motion to be inappropriate, it is clear from the representations quoted above, and it was apparent throughout the development of the record in this case, that the proposition plaintiff advances by its Motion is that defendant cannot "have it both ways." That is, that defendant cannot continue to use the Arthur Treacher's trademarks, tradenames, etc., while at the same time withholding the royalty payments—payment which represents the franchisee's "share of protecting the trademark." This position advocated by Arthur Treacher's is entirely persuasive. Whether or not plaintiff breached its contract relieving A&B of some portion of the royalty fees and whether or not plaintiff has violated the antitrust laws are questions which must await fuller development of the

record at the trial of this matter. In the meantime, plaintiff is on firm ground when it states that defendant "cannot have it both ways." Thus the Court, in an exercise of its equitable powers and based upon the clear position of plaintiff throughout this case with regard to the actual relief sought, will treat plaintiff's motion as one seeking alternative relief—*either* the payment of royalties pendente lite *or* the termination of A&B as a franchisee. Plaintiff's motion will be granted in that A&B will be ordered to pay past due and future royalties on a 4% basis pending litigation. This injunction will be granted on the condition that Arthur Treacher's take no action to terminate A&B's franchise and that Arthur Treacher's take no action which will prevent distributors and suppliers from supplying A&B with products necessary to the operation of its franchise, or otherwise interfering with A&B's sources of supply.[2] The Court is convinced that this is the most equitable temporary solution to this conflict and that it has the equitable power, in an exercise of its discretion under Rule 65(a) to mold this relief to meet the *unusual* exigencies of this case. *See Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944) (essence of equity jurisdiction is power of court to mold order to meet exigencies of case); *A.L.K. Corporation v. Columbia Pictures Industries, Inc.,* 440 F.2d 761, 763 (3d Cir. 1971) (district court must have considerable discretion in deciding preliminary injunction motion because of the infinite variety of situations which may confront it); *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir.) *cert. denied,* 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963) ("The infinite variety of situations in which a court of equity may be called upon for interlocutory injunctive relief requires that the court have considerable discretion in fashioning such relief"). *See also Columbia Broadcasting System, Inc. v. American So-*

**2.** The Court recognizes that the conditions upon which plaintiff's motion is granted coincide with part of the relief defendant sought in its motion. However, the Court is conditionally granting plaintiff's motion, it is not partially granting defendants' motion and thus, despite

the similarity of the conditions for the grant of plaintiff's motion with part of the relief sought in defendant's motion there will be no requirement on the part of defendant to post any bond. *See* Fed.R.Civ.P. 65(c).

*ciety of Composers, Authors & Publishers,* 320 F.Supp. 389, 392 (S.D.N.Y.1970) ("Although courts are rarely called upon to issue mandatory injunctions calling for the payment of moneys pendente lite, they have done so when the equities and the circumstances of the case demonstrated the appropriateness of the remedy").

With the foregoing discussion laid as a foundation, and recognizing the drastic nature of preliminary injunctive relief, and a concomitant duty on the Court's part to clearly articulate the reasons for granting this relief, the Court will now turn its attention to the task of further explicating the rationale for the grant of this relief.

A&B ceased paying royalties to Arthur Treacher's due to what A&B considered to be breaches of Arthur Treacher's obligations under the contract. Plaintiff gave notice of defendant's default and when defendant failed to cure, terminated defendant as a franchisee. The parties attempted to amicably resolve the dispute and when these negotiations failed, plaintiff instituted suit under the Lanham Act. Defendant then counterclaimed for, *inter alia*, breach of contract and antitrust violations. Tied into these alleged antitrust violations is defendant's insistence that the termination was invalid. However, it is inescapable that the parties entered into a contractual relationship whereby defendant would be authorized to use plaintiff's trademarks conditioned upon payment of royalties. Regardless of the validity of the termination and the defendant's allegations of breach of contract and antitrust violations, the crucial fact at this stage of the proceedings is that A&B continues to use Arthur Treacher's trademarks without paying for them. It would be grossly inequitable to allow this situation to continue pendente lite. There is certainly a basis in this record for A&B's counterclaims. If A&B successfully proves its claim of antitrust violations at trial, then its remedy will be an award of money damages. However, awaiting this, A&B cannot avoid payments under the contract on the basis that Arthur Treacher's is using that contract to violate the antitrust statute. *See Lewis v. Seanor Coal Co.,* 382 F.2d 437,

441 (3d Cir. 1967). This conclusion is premised on the Court's unwillingness to find, on the present record, that the mandatory injunction requiring payment of the contractual royalties pendente lite "would work to enforce 'the precise conduct made unlawful by the [Sherman Antitrust] Act.' " *Id, quoting Kelly v. Kosuga,* 358 U.S. 516, 520, 79 S.Ct. 429, 432, 3 L.Ed.2d 475 (1959). Therefore, in the present context of this case the Court is persuaded and will adhere to the often quoted policy "of preventing people from getting other people's property for nothing when they purport to be buying it." *Continental Wall Paper Co. v. Louis Voight & Sons Co.,* 212 U.S. 227, 271, 29 S.Ct. 280, 296, 53 L.Ed. 486 (1909) (Holmes, J., dissenting).

Similarly, with regard to defendant's breach of contract counterclaims, if A&B successfully demonstrates at trial that Arthur Treacher's breached the contracts and is not entitled to full royalties, then A&B's remedy will be contract damages perhaps including a set-off or recoupment of any royalties which are determined to have been improperly paid pendente lite.

The irreparable harm to Arthur Treacher's, absent the grant of this relief, is readily apparent. All parties agree that the royalties are the "lifeblood" ·of a franchise system. Without these royalties, Arthur Treacher's cannot exist. It has been represented to the Court that the company is presently on the verge of bankruptcy. The interesting aspect of this case is that both sides need each other's survival to maintain their own existence and yet they are grappling on the precipice of their mutual destruction. The parties readily concede this basic aspect of their relationship but nevertheless refuse, at least so far, to utilize this fact as a springboard toward an amicable resolution. Thus, the judicial intervention represented by this ruling is necessary. The Court finds that continued non-payment of royalties pending litigation will inescapably result in the destruction of Arthur Treacher's and this, without more, warrants a finding of irreparable harm pendente lite absent the mandatory injunction.

If Arthur Treacher's ultimately prevails at trial, any award of money damages could hardly compensate it if it is bankrupt and without a franchise system which took years to develop.

The harm to defendant by the grant of this injunction is minimal, if indeed any harm exists at all. There is no evidence contained in this extensive record that A&B cannot pay the royalties. Furthermore, as already noted, any harm to A&B resulting from the payment of royalties pendente lite can be easily cured by an award of money damages if it should ultimately prevail. In the meantime the system continues, the existence of both sides is preserved, and the inequity of allowing defendant to reap the benefit of using plaintiff's property without paying for it is remedied.

A discussion as to who will probably succeed on the merits has been purposely avoided. Both sides present viable claims, the adjudication of which must await a full dress trial. The plaintiff's motion and its defense to defendant's motion has raised "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953). This is not to say that defendant's position and its case has not raised similarly substantial questions going to the merits of this case. However, despite the presence of substantial questions on both sides, the balance of hardships in the present context of this case tips decidedly in plaintiff's favor. Therefore, the relief, as molded and conditioned in accordance with the foregoing opinion, will be granted to plaintiff and defendant's motion will be denied.[3]

**3.** This opinion was issued as a Bench Ruling on July 30, 1981 and an Order was entered that date. In lieu of a transcript, the Court has chosen to have the Bench Ruling prepared and filed as a written opinion. The result is the foregoing typewritten draft which is in full conformity with the handwritten draft with which the Court ruled from the Bench. The Order entered on July 30, 1981, following the Bench Ruling, reads as follows:

AND NOW, this 30th day of July, 1981, in accordance with the Bench Ruling entered this date, it is hereby ORDERED that plaintiff's Motion for Preliminary Injunction is hereby GRANTED as follows:

1. Defendant, A&B Management Corporation shall, within twenty (20) days of the date of this Order, pay all past due royalties to plaintiff computed on the basis of four (4%) of defendant's monthly gross receipts. Defendant shall continue to pay royalties to plaintiff pending the litigation of this case.

2. The grant of this preliminary mandatory injunction is conditioned upon the plaintiff taking no action to terminate defendant's franchise pending this litigation.

3. The grant of this preliminary mandatory injunction is further conditioned upon plaintiff taking no action to prevent distributors and suppliers from supplying defendant with products necessary to the operation of its franchise, or otherwise interfering with such supply.

4. This injunction will take effect upon the posting of a bond by plaintiff in the amount of One Hundred Thousand ($100,000) Dollars.

IT IS FURTHER ORDERED that defendant's Motion for Preliminary Injunction is DENIED.