375 A.2d 193

**The TRUSTEES OF the FIRST PRESBYTERIAN CHURCH OF PITTSBURGH, Appellant,**

v.

**OLIVER–TYRONE CORPORATION, a Pennsylvania Corporation, Appellee.**

Superior Court of Pennsylvania.

Argued Nov. 16, 1976.
Decided June 29, 1977.

Frank L. Seamans, Pittsburgh, with him Dale Hershey, Pittsburgh, for appellant.

David B. Fawcett, Pittsburgh, with him Charles W. Kenrick, Pittsburgh, for appellee.

Before JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT, and SPAETH, JJ.

WATKINS, President Judge, absent.

PER CURIAM:

The sole issue presented on this appeal is whether the lower court erred when it ruled that the parties to a 999-year lease by their conduct did not manifest an intent to periodically renegotiate the rentals due under the lease.[1] We hold that it did not and affirm the decree of the lower court.

The chancellor below found the following facts. The lease in question was entered into on October 14, 1902, between the Trustees of the First Presbyterian Church of Pittsburgh as lessor and Henry W. Oliver as lessee. It was for a term of 999 years[2] and was given in exchange for a cash payment of $150,000, and a $30,000 per annum rental fee. Various other covenants restricted the dimensions and usages of the commercial building which was to be constructed on the leased premises and two adjoining lots which Mr. Oliver owned in fee. Subsequently in 1902, 1903, 1904 and 1910 the parties agreed to permit certain changes in the structure of the building which were forbidden by the 1902 lease. Henry Oliver died on February 8, 1904, and the leasehold interest passed to his estate, then to his heirs in 1914, and then in 1935 to Pittsburgh Business Properties, Inc. (hereinafter referred to as PBP) which in 1955 changed its name to Oliver Tyrone Corporation.

In 1940, PBP was suffering losses on the property. It had continued to pay the $30,000 per year rent to the Trustees between 1902 and 1940. However, since 1938 the building had remained vacant and PBP wished to attract a new tenant, Spear & Co. To successfully conclude the negotiations with Spear & Co., PBP was required to make some $1,000,000 worth of improvements in the building. To meet

1. Appellant also raised in the court below an argument based on mutual mistake. This theory was not argued in their appellate brief, or orally, and is therefore deemed waived. *Sladkin v. Greene*, 359 Pa. 528, 59 A.2d 105 (1948).

2. Lower court approval to consummate the 999-year lease was sought and obtained by the Trustees pursuant to the provisions of the Price Act, Act of Assembly No. 304 of April 18, 1853, P.L. 503, then in effect.

these expenses PBP requested and obtained from the appellant a gradual reduction in the rental to $15,000 per annum. In 1940, the dimensions of the leased premises were increased to include property not covered by the 1902 lease, and the rent was set at $30,000 for 1940, $25,000 for 1941, $20,000 for 1942, and $15,000 for 1943. *This modification of the rent, by the express terms of the 1940 amendment, was to be in effect during the term of the Spear & Co. lease and renewals and extensions thereof but in no event longer than 50 years from the date thereof.* Spear & Co. and PBP entered into a 25 year lease of the building in 1942. In 1951 PBP renegotiated its lease of the building with Spear & Co. The substituted lease was for a period of 21 years (i. e. until December, 1972) and provided for a substantially greater rent by Spear & Co. to PBP. PBP and the Church also agreed to modify the rent upward to $40,000 in 1952 through 1955; $45,000 in 1956 and thereafter *"during the term of said new lease with Spear & Company . . . and any renewals and extensions provided for therein."* By agreement sale dated November 7, 1961, Oliver Tyrone Corp., the successor in interest to PBP, sold the building on the lease premises to Northwestern Mutual Life Insurance Company (hereinafter referred to as Northwestern) for $2,500,000, subject to the lease with the Church. Simultaneously, Northwestern leased the building back to Oliver Tyrone for 20 years and optional periods of renewal, with rent paid to Northwestern to decrease over the life of the leaseback. As part of the sale of the building to Northwestern, Oliver Tyrone executed an estoppel certificate to Northwestern to the effect that it (Oliver Tyrone) was not in default of the rent. The Church Trustees separately certified that Oliver Tyrone was not in default on the rent. From time to time thereafter during the 1960's appellant trustees considered the termination of the 1951 lease amendment and possible action to preserve the higher rental. However, the Church did not respond in December, 1972, to a written notification by Oliver Tyrone of the impending decline in rent to $30,000. This action to void or reform the lease was begun August 15, 1973.

The Church in effect argues that based upon the rather unusual facts of this case the parties have by their conduct modified the terms of the 1902 lease to anchor the amount of the rent either to Oliver Tyrone's return from the building and/or to general economic conditions,[3] thereby substituting a negotiated rent for the fixed rent in the 1902 lease. They thus contend that there exists a legal duty on the part of the appellee to renegotiate the terms of the lease. Appellee contends, however, that these modifications, specifically the 1940 and 1951 amendments to the 1902 lease, were by their express terms, temporary modifications such that upon the expiration of the Spear & Co. sub-lease[4] in 1972 the original rental amount of $30,000 once again became operative.[5]

The resolution of the issue thus presented involves the interpretation to be placed upon the legal and factual history of this case, particularly the wording of the amendments themselves. As the lower court opinion indicates the 1940 amendment reviewed the history of the negotiations and the renovations required for the structure, reiterated the 999-year term and cited the financial difficulties of PBP. And in Paragraph 3, the rental payments were altered as follows:

3. The chancellor specifically found that the $30,000 ground rental now being paid by the appellee to the appellant is not related to the economic return received by appellee from the leased premises.

4. Spear & Co. constricted its operations in 1954, vacated the building in 1958, and ceased paying rent in April, 1959. Ohringer Furniture Co. replaced Spear as sub-tenant and shortly thereafter it also went out of business. No detailed testimony was presented by either party on the present use of the building, however, it does appear that the building is presently occupied on the first floor by diverse retail establishments, and on other floors by offices.

5. Appellee additionally contends that the appellant's failure to assert a duty to renegotiate prior to, at, or after the sale of the leaseback transaction with Northwestern in 1961 and the appellant's acquiescence in appellee's subsequent investment of millions of dollars in the property constitutes such gross laches that relief should be denied irrespective of the merits of appellant's claim on appeal. Because we hold that appellant's arguments are without merit we need not decide this point.

It is agreed that the rent reserved in said original Lease is modified so that the rent reserved both *thereunder* and *hereunder* shall be as follows:

For the calendar year 1940, $30,000; for the calendar year 1941, $25,000; for the calendar year 1942, $20,000; for the calendar year 1943 and each calendar year thereafter during the term of said Spear & Co. lease and any renewals or extensions thereof $15,000, to which shall be added 20% of any excess rent under said proposed lease with Spear & Co., or renewals and extensions thereof, that the Assignee may receive in any calendar year by reason of the net sales of such prospective tenant exceeding the sum of $6,000,000 in any calendar year. Such share of excess rent shall be paid by the Assignee to the Trustees forthwith upon receipt thereof by the Assignee. *Such modification of rent shall be in effect during the term of such Spear & Co. lease and renewals and extensions thereof but in no event for a period longer than fifty years from the date hereof.* (Emphasis supplied.)

Of significant importance to the resolution of the issue in this case is the fact that all other modifications of the 1902 lease by the 1940 amendment were without time restrictions.[6] Only the rental modification was limited in duration to the term of the Spear & Co. lease. The 1951 amendment, likewise, limited the duration of the increase in the rental amount to the Spear & Co. lease in that the supplementary indenture read as follows:

It is agreed that the rent reserved in said Original Lease and the Supplementary Indenture of Lease, dated the 18th day of July, 1940, is modified so that the rent reserved both *thereunder* and *hereunder* shall be as follows:

For the calendar year 1952, $40,000; for the calendar year 1953, $40,000; for the calendar year 1954, $40,000; for the calendar year 1955, $40,000; for the calendar year 1956 and each calendar year thereafter during the term of

6. Other changes made by the 1940 amendment were the altering of the building restrictions (Paragraphs 1 and 2), and a provision for cancellation by the lessee upon sixty days notice (Paragraph 4). As noted above, these modifications were without temporal limitations.

said Spear & Company lease recited above and any renewals or extensions thereof, $45,000; payable quarterly in advance; *said modifications of rent shall be in effect during the term of said new lease with Spear & Company recited above,* effective January 1, 1952, *and any renewals and extensions provided for therein.* (Emphasis supplied.)

It has long been the law in our Commonwealth that it is competent for the parties to a written contract to show that it was subsequently abandoned in whole or in part, modified, changed or a new one substituted, either by writings or by words or by conduct or by all three. *Arndt, Preston, Chapin, Lamb & Keen, Inc. v. L–M Mfg. Co.,* 163 F.Supp. 406 (E.D.Pa.1958), *aff'd* 262 F.2d 343 (3rd Cir. 1958); *Consolidated Tile & Slate Co. v. Fox,* 410 Pa. 336, 189 A.2d 228 (1963); *Dora v. Dora,* 392 Pa. 433, 141 A.2d 587 (1958); *Barr v. Deiter,* 190 Pa.Super. 454, 154 A.2d 290 (1959); *Muchow v. Schaffner,* 180 Pa.Super. 413, 119 A.2d 568 (1956); *DeLong Hook & Eye Co. v. Vogue Silk Hosiery Co.,* 108 Pa.Super. 369, 164 A. 848 (1933). The appellant urges that the failure of the amendment to state whether or not at the expiration of the periods provided for the rent reverts back to the $30,000 per annum limit renders them ambiguous. We find this argument unpersuasive. Each interim renewal adjustment was expressly limited to a specific duration in that it was tied in with the duration of the Spear & Co. lease. The precise wording of the language used in the drafting of the amendments and the fact that among the numerous changes that were made only the rental was limited in such a fashion, conclusively illustrate that at the time of the agreement to modify the pre-existing leases it was the intent of the parties that such modification be temporary and not permanent. These amendments must be construed in light of the terms of the 1902 lease in a reasonable and equitable manner and should be limited to their express terms and whatever is reasonably and fairly implied by their terms. 52 C.J.S. Landlord & Tenant § 503e (1968). Thus, on their face, the 1940 and 1951 amendments do not rescind the 1902 rent provision beyond the term of the Spear & Co. Lease. *Na-*

*tional City Bank of Cleveland v. Citizen's Bldg. Co. of Cleveland,* 48 Abs. 325, 74 N.E.2d 273 (1947). *See Rohrheimer v. Hofman,* 103 Pa. 409, 411, 2 Leg.Rec. 375 (1882). *See generally Knight v. Gulf Refining Co.,* 311 Pa. 357, 166 A. 880 (1933); *Rea v. Ganter,* 152 Pa. 512, 25 A. 539 (1893).

 The appellant additionally argues, however, that irrespective of the language of the lease amendments, the parties by negotiating these amendments, conducted themselves in such a manner as to illustrate their intent to substitute a periodically negotiated rent for the fixed rent in the 1902 lease. The appellant has failed to support this contention with evidence that is clear, precise and convincing. *Edelstein v. Carole House Apartments, Inc.,* 220 Pa.Super. 298, 286 A.2d 658 (1971); *Crown v. Cole,* 211 Pa.Super. 388, 236 A.2d 532 (1967). While it is true that the parties in 1940 agreed to negotiate a rent modification because the building had been vacant for a number of years, there was no legal duty on the part of the Church to enter into such negotiations. As the appellee correctly points out, the agreement was a voluntary response on the part of the Church and PBP to the then existing economic conditions: the building was vacant, taxes and other expenses continued, and a new subtenant had been found whose demands necessitated alterations and modernization costing approximately $1,000,000. Clearly it was in the mutual self interest of the parties to reach the temporary accommodation that resulted in the rent reduction for the specified term. At that time and at no time between 1902 and 1940 can the conduct of the parties reasonably be construed as illustrating an intent that the rent should periodically be renegotiated.[7] Nor can the activities of the parties in the post-1951

---

7. The appellant argues that the fact that the 1940 amendment, by permanently adding a parcel of land to the leasehold premises which was not contained in the 1902 lease, warrants the conclusion that the essential terms of the 1902 lease no longer exist. It reasons that a return to the $30,000 figure, in light of the addition of land, could not possibly have been intended since no reasonable person would have assented to a modification which would permanently place him in a position worse than he held under the original agreement. We find this argument unpersuasive. The modification was not permanent

period support such a contention. As the chancellor correctly noted:

> In the post-1951 period, tenants came and went from the Oliver structure. The building was remodeled and revamped. Economic indices rose and fell, but neither party requested a renegotiation of the rental terms.

Such facts clearly illustrate that the intent of the parties, as illustrated by their conduct, was that the 1902 rental figure not be rescinded and that there was to be a reversion to the original rental amount upon the expiration of the specified contingency, i. e. expiration of the Spear & Co. lease.[8]

We, therefore, hold that the conduct of the parties failed to modify the terms of their agreements by creating a legal duty to periodically renegotiate the rental and that the facts as illustrated by the record are insufficient to refute or modify the clear language of the documents themselves.

The decree of the lower court is affirmed.

---

but only for the duration of the Spear & Co. Lease. Furthermore, it was to the advantage of both parties. The building had been vacant for two years and the appellants faced the possible loss of a tenant. If the appellee quit the building the appellant would have had to assume the taxes and expenses of maintaining the building. In order to acquire an occupant for the building the appellee had to expend one million dollars. A rent reduction made the improvements possible and the appellee's increased financial involvement in the site helped insure payment of future rents.

8. We also agree with the chancellor's reasoning that even if we were to construe the agreements as ambiguous, the standard of interpretation is the meaning attached by persons acquainted with uses and customs at the time of the contract negotiations. *Wilkes-Barre Township School District v. Corgan*, 403 Pa. 383, 386, 170 A.2d 97, 99 (1961). Therefore, based upon their experience with the Spear & Co. lease, both the appellant and PBP were familiar with the language of percentage leases and the manner of adjusting rental payments to economic return. In fact, the 1940 amendment included such a provision tied to the volume of the Spear & Co. sales. Therefore, it must be assumed that, if the parties were desirous of a similar arrangement for the ground lease, a percentage or fluctuating rental would have also been included in that writing.