519 A.2d 997

DANIEL ADAMS ASSOCIATES, INC., Appellant,

v.

RIMBACH PUBLISHING, INC., and Richard J. Rimbach, Jr., Appellees.

Daniel D. ADAMS, Appellee,

v.

RIMBACH PUBLISHING COMPANY and Richard J. Rimbach, Jr., Appellants.

Daniel ADAMS, Appellant,

v.

RIMBACH PUBLISHING, INC., and Richard J. Rimbach, Jr., Appellees.

Superior Court of Pennsylvania.

Argued April 9, 1986.

Filed Jan. 9, 1987.

74

Bernard M. Berman, Media, for appellant (at 1647 and 1649) and appellee (at 1648).

George J. McConchie, Media, for appellants (at 1648) and appellees (at 1647 and 1649).

Before CIRILLO, President Judge, and ROWLEY and WIEAND, JJ.

WIEAND, Judge:

These cross-appeals require that we review post-trial orders entered by the trial court in actions for breach of an employment contract and for malicious interference with the contract existing between a sales representative and his employer, the publisher of a trade magazine. Although the history of the proceedings is lengthy and complex, the underlying issues concern (1) the terms of the contract of employment and (2) whether the vice president of a corporate employer who discharges an employee can be held individually liable for interfering with the contract of employment between the employee and the corporate employer. To place these issues in context, we begin the arduous task of reviewing the proceedings which brought this matter before the Superior Court for review.

In July, 1968, Daniel Adams was employed by Richard Rimbach, the publisher of a trade magazine, to solicit and sell advertising space. The written agreement provided that Adams was to be paid a commission of twenty percent of the net income derived from sales which he would make within the territory assigned to him. This agreement could be terminated by either party, with or without cause, upon written notice. In the event of termination by the employer, however, Adams was to be paid commissions for advertising which appeared in the three issues of the magazine published after his termination.[1]

In 1972, the publishing firm was incorporated under the name of Rimbach Publishing, Inc. Rimbach's son, Richard Rimbach, Jr., received fifty percent of the stock of the new corporation, was elected a director, and was named corporate vice president. In 1973, following incorporation, new contracts of employment were mailed to all sales representatives, including Adams. Accompanying the new contracts were transmittal letters requesting each sales representative to sign the contract and return it to the employer. The letter of transmittal stated that the contract would thereafter be executed by the corporate employer, who would mail an executed copy to each employee. Adams signed his contract and returned it to his employer. It was thereafter signed on behalf of the corporate employer by Richard Rimbach, Jr., the vice president. Adams denied ever receiving an executed copy of the agreement, although the employer's evidence was that a copy had been given to Adams' secretary. The provisions of this agreement called for the same commissions, i.e., twenty percent, and again permitted termination by either party upon written notice. By the terms of this agreement, however, if Adams were terminated by the employer, his recovery of commissions was limited to those accruing in the next edition of the publication to

---

1. Both Adams and the publisher purported to sign the contract on behalf of corporate entities. However, neither corporation had been formed at the time when the contract was executed. Because the parties have not questioned this apparent irregularity, we do not address this issue.

be printed following his dismissal. His territory was also reduced in size by the elimination therefrom of northern New Jersey.

In June, 1978, Adams' contract was terminated, and written notice thereof was duly given. Adams contended that he had been discharged because he refused to discontinue doing work for Instrument Society of America, a competitor, who had previously recruited and taken from Rimbach a junior editor. The employer, on the other hand, premised Adams' discharge upon a poor sales record. In any event, Adams was paid commissions in the amount of $18,085.49, which sum represented advertising sold by Adams for the next edition of the magazine published after his termination. A demand for an additional $16,000, which was alleged to be the amount of commissions accruing for the two succeeding editions of the publication, was rejected by the employer.

In 1979, Adams filed an action in assumpsit based on an alleged oral agreement of employment which he had made with Richard Rimbach, Sr. in 1968. In 1982, Adams filed a second action in which he alleged that the corporate employer had breached the written agreement which had been executed in 1968. In a second count of the 1982 complaint, Adams alleged that Richard Rimbach, Jr. and his corporation were liable for wrongful discharge and for maliciously interfering with Adams' contract of employment. The two actions were consolidated for trial. At trial, the court directed a verdict in favor of all defendants in the 1979 action[2] and on the second count of the 1982 action. The

2. The 1979 action had been filed by Adams against the defendants on his own behalf and on behalf of a corporation which allegedly succeeded to his business in 1971 to recover for the defendants' asserted breach of an oral agreement entered into by Adams and Rimbach's father in 1968. Like the suit filed in 1982, the 1979 action was based upon Adams' dismissal by Rimbach in 1978. Adams was dismissed as a plaintiff in the 1979 action because, the trial court held, his obligations under the alleged oral agreement had been assumed by his corporation. This decision was affirmed by the Superior Court, and the case was remanded for further proceedings. After the 1979 action had been consolidated and tried with the suit which Adams

first count of the 1982 action was submitted to a jury, which returned a verdict in favor of Adams in the amount of $150,000. All parties filed motions for post-trial relief. The defendants requested judgment n.o.v. or, at least, a remittitur with respect to the damages awarded for breach of contract; and the plaintiff asked the court to remove the directed verdict and remand for a new trial on the second count of the 1982 complaint. The trial court denied the employer's request for judgment n.o.v. but remitted that portion of the jury's verdict which exceeded $16,000. With respect to the cause of action for wrongful discharge, the court denied Adams' motion for new trial. However, the trial court vacated its directed verdict on the claim for malicious interference with contract and granted a new trial thereon. It is these actions by the trial court which are before us for review in this appeal.

## I. MALICIOUS INTERFERENCE WITH CONTRACT

■ The cause of action for malicious interference with contract is defined in the Restatement (Second) of Torts § 766. This section of the Restatement, which was adopted by the Pennsylvania Supreme Court in *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1 A.L.R.4th 1144 (1978), *cert. denied, Epstein v. Adler, Barish, Daniels, Levin and Creskoff*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979), provides as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766. Essential to a right of recovery under this section is the existence of a contractual relationship between the plaintiff and a "third person"

later instituted in 1982, a directed verdict was entered for the defendants on all counts of the 1979 complaint.

other than the defendant. See: *Glenn v. Point Park College*, 441 Pa. 474, 479, 272 A.2d 895, 898 (1971); *Raab v. Keystone Insurance Co.*, 271 Pa.Super. 185, 189, 412 A.2d 638, 640 (1980). Accord: *Wells v. Thomas*, 569 F.Supp. 426, 434 (E.D.Pa.1983); *Vuksta v. Bethlehem Steel Corp.*, 540 F.Supp. 1276, 1282 (E.D.Pa.1982), *aff'd*, 707 F.2d 1405 (3d Cir.), *cert. denied*, 464 U.S. 835, 104 S.Ct. 121, 78 L.Ed.2d 119 (1983); *DuSesoi v. United Refining Co.*, 540 F.Supp. 1260, 1275 (W.D.Pa.1982). Cf. *Yaindl v. Ingersoll-Rand Co.*, 281 Pa.Super. 560, 422 A.2d 611 (1980) (interpreting Restatement (Second) of Torts § 342B which creates a cause of action for intentional interference with prospective contractual relations). By definition, this tort necessarily involves three parties. The tortfeasor is one who intentionally and improperly interferes with a contract between the plaintiff and a third person. In the instant case, however, the contract was between the plaintiff and a corporate employer, and the named defendant is the officer and director who, while acting on behalf of the corporation, terminated plaintiff's contract of employment.

 A corporation is a creature of legal fiction which can "act" only through its officers, directors and other agents. *Lokay v. Lehigh Valley Cooperative Farmers, Inc.*, 342 Pa.Super. 89, 97, 492 A.2d 405, 408 (1985). See: *Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637 (1978); *Pollock Industries, Inc. v. General Steel Castings Corp.*, 203 Pa. Super. 453, 201 A.2d 606 (1964). Acts of a corporate agent which are performed within the scope of his or her authority are binding upon the corporate principal. See: *Lokay v. Lehigh Valley Cooperative Farmers, Inc.*, *supra* 342 Pa. Super. at 97, 492 A.2d at 409. See also: *Sayre Land Co. v. Borough of Sayre*, 5 Pa.D. & C.2d 294, 300–301 (Bradford Cty. 1955), *aff'd*, 384 Pa. 534, 121 A.2d 579, 583 (1956); *Peterson v. Marianna Borough*, 310 Pa. 524, 528, 165 A. 838, 839 (1933); *Hahnemann Hospital v. Golo Slipper Co.*, 135 Pa.Super. 398, 403, 5 A.2d 605, 607 (1939). Where a party contracts with a corporation through a corporate agent who acts within the scope of his authority and reveals his principal, the corporate principal alone is liable for

breach of the contract. See: *Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 373, 246 A.2d 407, 409 (1968); *Bucks v. Buckwalter*, 419 Pa. 544, 546, 215 A.2d 625, 627 (1966); *Geyer v. Huntingdon County Agricultural Association*, 362 Pa. 74, 77, 66 A.2d 249, 250 (1949); *Levy v. Conly*, 340 Pa. 332, 336, 17 A.2d 382, 383 (1941); *Rossi v. Pennsylvania State University*, 340 Pa.Super. 39, 56, 489 A.2d 828, 837 (1985); *Silverman v. Polis*, 230 Pa.Super. 366, 372, 326 A.2d 452, 455 (1974); *Perlman v. Pittsburgh Cabinets & Builders Supplies, Inc.*, 191 Pa.Super. 234, 236, 156 A.2d 373, 375 (1959).

In *Raab v. Keystone Insurance Co., supra,* James Raab sought recovery of no-fault insurance benefits from his insurer, Keystone Insurance Company, after he had been injured in a motor vehicle accident. Ed O'Keefe, a claims supervisor employed by the insurance company, was assigned to handle Raab's claim. Although medical and work loss benefits were paid to Raab for a period of three months following the accident, no further payments were made. Raab and his wife brought suit against both the insurance company and O'Keefe, the claim supervisor. Two theories of recovery were asserted in the complaint: the first sought recovery for the physical and emotional injuries suffered by the plaintiffs because of the insurance company's negligent failure to pay benefits according to the contract; the second asserted O'Keefe's alleged malicious interference with the contractual relationship between the insurance company and the plaintiffs. The trial court sustained preliminary objections in the nature of a demurrer and dismissed the complaint.

A divided panel of this Court affirmed. With respect to the claim for malicious interference with contract, the majority adopted the opinion of the trial court as follows:

In the instant matter, Plaintiffs would have this court view O'Keefe, a claims supervisor employed by the Defendant Company, as a third party who interposed himself between two parties to an agreement. However, Plaintiffs aver in the Complaint that O'Keefe "at all

relevant times was the agent, servant, and/or employee of the defendant, Keystone Insurance Company, at all times acting within the course of his employment and scope of his authority, under and subject to the direct and exclusive control and supervision of the defendant...." Inasmuch as Defendant Company can only act through its employees and O'Keefe is identified by Plaintiffs as the individual responsible for failing to authorize payments, the individual Defendant and the Company defendant are one and the same entity for purposes of this action. Consequently, there is no third party against who [sic] a claim of interference with contract can lie. Hence, Defendants' demurrer to Plaintiffs' contention that O'Keefe's conduct constituted malicious interference with a contractual relationship must be sustained.

*Id.* 271 Pa.Super. at 188–189, 412 A.2d at 639–640.

Equally instructive are federal decisions interpreting Pennsylvania law and applying it to facts similar to those in the instant case. In *DuSesoi v. United Refining Co., supra,* an employee of the defendant corporation, who had been discharged by the corporation's president, brought an action against both the president and the parent corporation for tortious interference with contractual relations. The United States District Court for the Western District of Pennsylvania dismissed the claim, holding that a corporation could not tortiously interfere with an agreement to which it was party. *Id.* at 1275. The court observed that the tort for malicious interference with contract, as defined in Section 766 of the Restatement (Second) of Torts, applied exclusively to interference caused by a third party. *Id.* Because a corporation may act only through its officers and agents, the court concluded, the actions of the officers in terminating contracts on behalf of the corporation could not be considered malicious interference by the individual officer or agent. *Id.* Similar reasoning was employed by the United States District Court for the Eastern District of Pennsylvania in *Vuksta v. Bethlehem Steel Co., supra,* where the plaintiff had asserted a claim for malicious

interference with contract after his employment as a mechanical engineer at Bethlehem Steel had been terminated by corporate officers. In dismissing this claim, the court, relying on *Raab,* held that "[s]ince a corporation can only act through its agents and the individual defendants are identified as Bethlehem's agents, there is no third party against whom an action can lie." *Id.* at 1282. Most recently, in *Wells v. Thomas, supra,* the court for the Eastern District of Pennsylvania held that the personnel director of a hospital could not assert a cause of action for intentional interference with contractual relations against either the hospital at which he had been employed or its management employees who had terminated his employment. The court reasoned: "When the individual defendants allegedly engaged in tortious interference with [the plaintiff's] business relationship with the [hospital], they were managerial employees acting in their official capacities. Accordingly, no 'third party' can be said to have interfered with [the plaintiff's] relationship to her former employer." *Id.* at 435. See also: *Fincke v. Phoenix Mutual Life Insurance Co.,* 448 F.Supp. 187 (W.D.Pa.1978); *George A. Davis, Inc. v. Camp Trails Co.,* 447 F.Supp. 1304 (E.D.Pa.1978).

■ These decisions are analytically compelling. We conclude, therefore, that where, as here, a plaintiff has entered into a contract with a corporation, and that contract is terminated by a corporate agent who has acted within the scope of his or her authority, the corporation and its agent are considered one so that there is no third party against whom a claim for contractual interference will lie.

Adams' reliance upon the decision by a panel of this Court in *Yaindl v. Ingersoll-Rand Co., supra,* is misplaced. There, the plaintiff had been employed by Ingersoll-Rand at its Standard Pump-Aldrich Division (SP–AD) plant when he was fired by a plant officer. When the plaintiff attempted to obtain employment with another departmental division of Ingersoll-Rand, Turbo Products Division (Turbo), several officers of the SP–AD plant contacted the hiring personnel at the other division. As a result of information provided

by these officers, the plaintiff was not hired by Turbo. Consequently, the plaintiff brought an action against Ingersoll-Rand, alleging a theory of intentional interference with prospective contractual relations. Specifically, he asserted that the officers of the SP–AD plant had interfered with his prospect for obtaining employment with Turbo. The trial court dismissed this claim on motion for summary judgment. In reversing the entry of summary judgment, the Superior Court noted that although SP–AD and Turbo were both divisions within the same corporation, they were each sufficiently autonomous so as to be considered separate. *Id.* 281 Pa.Super. at 585, 422 A.2d at 624. Thus, when officers of SP–AD gave information to Turbo about the plaintiff, they were not "interfering" with a contract to which SP–AD was a party, but rather were affecting the prospective contractual relationship between the plaintiff and a completely separate and distinct "third party" corporate entity. Upon this basis the court held that it was possible for an officer of one corporation to interfere with the prospective contractual relationships of another corporation owned by the same conglomerate. *Id.*, 281 Pa.Superior Ct. at 586–587, 422 A.2d at 625. *Yaindl* is not factually the same as the instant case. There the corporate officers had acted outside the scope of their authority by interfering with the plaintiff's prospective employment with a completely separate and distinct corporate entity; whereas, in the case sub judice the corporate agent, Rimbach, was acting within the scope of his authority when he terminated a contract already in existence between the plaintiff and Rimbach's corporate employer, Rimbach Publishing. The holding in *Yaindl*, therefore, is inapposite to the instant case.

There is another reason why the directed verdict on the malicious interference with contract claim was correct and should not have been disturbed. As we shall see, both the 1968 and the 1973 agreements permitted the employer to terminate Adams' employment contract at will. When Rimbach acted to discharge Adams, whether because he had a poor sales record or because he was doing work for a

competitor, the discharge was in accordance with the terms of the contract and was not actionable.

An almost identical fact pattern was presented to the Supreme Court in *Menefee v. Columbia Broadcasting System, Inc.*, 458 Pa. 46, 329 A.2d 216 (1974). There, Robert Menefee, a radio talk show personality, had been employed by radio station WCAU, a wholly-owned subsidiary of the Columbia Broadcasting System, Inc. (CBS). Pursuant to a provision in Menefee's contract of employment, the general manager of WCAU, John O. Downey, and the vice president of CBS, Michael Grant, had exercised the right to terminate Menefee's employment upon thirteen weeks notice. Menefee brought an action against Downey, Grant and CBS in which he alleged, inter alia, that Downey and Grant had conspired to interfere with Menefee's contractual relationship with CBS. The trial court entered summary judgment on this claim, holding that CBS had a contractual right to terminate Menefee on thirteen weeks notice and that Downey and Grant were merely the agents through which CBS had acted. Both the Superior Court and the Supreme Court affirmed the dismissal of Menefee's claim for conspiracy to interfere with contractual relations. In so doing, the Supreme Court observed, as did the trial court, that CBS had an absolute right to terminate Menefee's contract upon thirteen weeks notice. *Id.*, 458 Pa. at 55–56, 329 A.2d at 221. With respect to Downey and Grant, the Court held that "as employees of the radio station with a privilege to advise the station on handling its employees," these individuals "were privileged to cause the station to terminate the contract." *Id.*, 458 Pa. at 56, 329 A.2d at 221.

The instant case is controlled by *Menefee*. As that decision makes clear, Rimbach Publishing had an absolute contractual right to terminate Adams' contract and Rimbach, acting within the scope of his authority as its corporate officer, was privileged to exercise that right. Adams' discharge by Rimbach on behalf of the publishing company, therefore, did not give rise to a claim by Adams for inten-

tional interference with contractual relations. For the foregoing reasons, it was error for the trial court to grant a new trial on the cause of action for malicious interference with Adams' contract of employment.

## II. WRONGFUL DISCHARGE

■ The trial court entered a directed verdict on the wrongful discharge claim in favor of the employer and denied Adams' subsequent motion for new trial because, in the court's judgment, Adams was an independent contractor whose contract was terminable at will upon written notice. We find it unnecessary to determine whether Adams was an employee of the publisher or an independent contractor. In either event, it seems clear that his employment was at will and could be terminated upon notice. In this respect, the provisions of the 1968 and 1973 contracts were identical. Either contract could be terminated by the publishing company at any time upon written notice to Adams. There was no evidence from which the jury or the trial court could find any rights greater than those conferred by the written agreement. The directed verdict on the wrongful discharge claim was proper and will be affirmed.[3]

## III. BREACH OF CONTRACT

Whether Adams is entitled to recover commissions in excess of those already paid by the publishing company depends upon whether his rights are to be determined by the 1968 contract or the 1973 contract. The 1968 contract, it will be recalled, required the publishing company, in the event of terminating Adams' contract, to pay him commis-

---

3. We may affirm the decision of the trial court if it is correct for any reason. See: *E.J. McAleer & Co. v. Iceland Products, Inc.,* 475 Pa. 610, 613 n. 4, 381 A.2d 441, 443 n. 4 (1977); *Gwinn v. Kane,* 465 Pa. 269, 279 n. 12, 348 A.2d 900, 905 n. 12 (1975); *Pascone v. Thomas Jefferson University,* 357 Pa.Super. 524, 528, 516 A.2d 384, 386 (1986); *Green v. Juneja,* 337 Pa.Super. 460, 464 n. 5, 487 A.2d 36, 39 n. 5 (1985); *Emerick v. Carson,* 325 Pa.Super. 308, 316 n. 2, 472 A.2d 1133, 1137 n. 2 (1984).

sions accruing from three succeeding editions of the magazine published after his discharge. The 1973 contract, however, required the payment of commissions only for the next issue published following his termination. Believing the controlling terms to be those included in the 1973 agreement, the publishing company paid Adams the sum of $18,085.49. At trial, Adams contended that he was entitled to recover an additional $16,000 in commissions for advertising sold in two additional issues published after his dismissal.

It is not disputed that the initial agreement between Adams and the unincorporated publishing firm was executed in 1968. It is similarly undisputed that this contract was adhered to by the corporation after it had been formed in 1972. The corporate employer contended at trial and also contends on appeal that the 1968 contract was superseded by the 1973 contract between Adams and Rimbach Publishing, Inc.

"Parties to a written contract may show that it was subsequently abandoned in whole or in part, modified, changed or a new one substituted...." *Priester v. Milleman,* 161 Pa.Super. 507, 516, 55 A.2d 540, 545 (1947). See: 17 Am.Jur.2d *Contracts* § 459. The party asserting a substituted contract, however, has the burden of proving that the parties intended to discharge the earlier agreement. See: *Buttonwood Farms, Inc. v. Carson,* 329 Pa.Super. 312, 317, 478 A.2d 484, 486 (1984). See also: *M.S. Jacobs and Associates, Inc. v. Duffley,* 452 Pa. 143, 303 A.2d 921 (1973); *Jacobson and Company v. International Environment Corp.,* 427 Pa. 439, 235 A.2d 612 (1967); *Yoder v. T.F. Scholes, Inc.,* 404 Pa. 242, 173 A.2d 120 (1961); *First Pennsylvania Bank, N.A. v. Triester,* 251 Pa.Super. 372, 380 A.2d 826 (1977); *Kritz v. Axler,* 134 Pa.Super. 120, 3 A.2d 943 (1939). The intention of the parties to substitute a new contract for a prior agreement may be shown by other writings, by words, by conduct or

by all three. See: *Buttonwood Farms, Inc. v. Carson, supra* 329 Pa.Super. at 318, 478 A.2d at 487. See also: *Trustees of First Presbyterian Church of Pittsburgh v. Oliver-Tyrone Corp.,* 248 Pa.Super. 470, 375 A.2d 193 (1977); *Hydro-Flex, Inc. v. Alter Bolt Co.,* 223 Pa.Super. 228, 296 A.2d 874 (1972).

■ In the instant case, the corporate publishing company met this burden by showing that Adams had signed a new contract with the corporation in 1973. The fact that an individual has signed an apparently complete expression of the terms of a contract is strong evidence that he or she is thereby expressing his or her unconditional assent, and, unless there is some evidence to the contrary, it may be conclusive of his or her intention to be bound. See: 1 *Corbin on Contracts* § 31, at 117. Nevertheless, the trial court submitted the case to the jury to determine whether the contract had been executed by the corporation and whether an executed copy had been delivered to Adams prior to the time when he was discharged. This, we are constrained to conclude, was error.

■ A written contract which has not been signed by one of the parties will nevertheless create a valid, binding agreement if both parties manifest their assent to its terms. See: *Sullivan v. Allegheny Ford Truck Sales,* 283 Pa.Super. 351, 358, 423 A.2d 1292, 1295 (1980). See also: *L.B. Foster Co. v. Tri-W Construction Co.,* 409 Pa. 318, 186 A.2d 18, 3 A.L.R.3d 1142 (1962); 17 Am.Jur.2d *Contracts* § 70. Moreover, unless the parties to a contract so stipulate, physical delivery of the instrument is not essential to the creation of a legally enforceable agreement. See: 17 Am.Jur.2d *Contracts* § 74; 17 C.J.S. *Contracts* § 64. So long as the parties intend to be bound by the contract, the failure of one party to receive an executed copy of the agreement will not prevent it from becoming operative. See: *Id.* Thus, neither the possibility that the publishing

company failed to execute the 1973 contract until after Adams had been discharged nor the alleged failure of the publishing company to deliver a fully executed copy of the contract to Adams was legally sufficient to destroy the efficacy of the contract which Adams had signed in 1973. That agreement, by mutual consent of the parties, had superseded the earlier agreement and defined the rights of Adams and the corporate successor to the publishing business which had previously been conducted as a sole proprietorship by Richard Rimbach, Sr. It was offered by the corporation to all sales representatives and was accepted by Adams when he signed the written contract and returned it to the corporate publisher in 1973.

■ The agreement signed by Adams in 1973 provided that it could be terminated upon written notice by either party. In the event it was terminated by the publisher, however, Adams was to be paid all commissions accruing from his customers for the next issue published after his termination. Adams was terminated in June, 1978, in accordance with the terms of the contract between the parties. The termination was not wrongful. He was entitled to receive thereafter those commissions which accrued from the next monthly installment of the trade publication. These commissions were paid and received by Adams. He had no cause of action for further damages.

Because Adams as a matter of law has failed to establish a cause of action for breach of contract against Rimbach Publishing, Inc. or Richard J. Rimbach, Jr., we find it unnecessary to review the trial court's exercise of discretion with respect to the granting of remittitur. That issue has become moot.

The order of the trial court is affirmed in part and reversed in part as set forth in the foregoing opinion. The case is remanded to the trial court for the entry of judgment in favor of Rimbach Publishing, Inc. and Richard Rimbach, Jr.