# Cook v. S. Walter Packaging Corporation

384

*Jeffrey L. Abrams,* for appellant.
*Jeffrey B. McCarron,* for appellees.

TERESHKO, *J.,* February 8, 2005—

## I. PROCEDURAL HISTORY

Plaintiff, Sherrie Cook, appeals from an order dated August 20, 2004, whereby the court granted defendant's post-trial motions to set aside the July 21, 2004 verdict for plaintiff and awarded a new trial.

## II. FACTUAL BACKGROUND

S. Walter Packaging Corporation is a nationwide manufacturer and retailer of custom-made packaging products. Mr. Andrew Wilson is the president of S. Walter and Mr. Richard Gettlin is its chief financial officer.

Ms. Sherrie Cook was a shareholder in, and was in charge of sales for a small business providing similar services to S. Walter. The name of Ms. Cook's business was Accent International Inc., which was located in California.

In May 2000, after significant discussions between S. Walter and Accent, the parties entered into a proposed joint venture arrangement by which Accent's sales operations effectively would be merged into S. Walter, with Accent's customers being serviced and billed by S. Walter. The specifics of the proposed joint venture were incorporated in a May 4, 2000 letter from Mr. Gettlin to Mr. Ralph Dillon. The relevant points of the letter include: (1) that Mr. Dillon and Ms. Cook would receive a compensation package with a guaranteed rate of $125,000 per year, (2) that Mr. Dillon and Ms. Cook would share in any new sales at a rate of 35 percent of the gross profit, and (3) that sales commissions would be paid to Mr. Dillon and Ms. Cook at their then-current rates. (Letter of S. Walter Packaging Corp. dated May 4, 2000, p. 1.)

After a due diligence examination was conducted of Accent, a sales representative agreement (SRA) was executed between S. Walter and Ms. Cook on June 11, 2000. The SRA provided that Ms. Cook was employed in the capacity of a sales representative, which required her to devote her entire work-related time, energy, attention and ability exclusively to the business of the S. Walter. (SRA dated June 11, 2000, p. 1.) The SRA provided that the term of the contract was for five years and would continue on a year-to-year basis thereafter. (SRA dated June 11, 2000, p. 1.)

Additionally, paragraph 3 of the SRA specifically states, "[t]he representative is retained solely at the will and discretion of the company. The company may terminate representative's engagement at any time, with cause." (SRA dated June 11, 2000, p. 1.)

The SRA detailed the compensation terms as follows:

"(A) Base reimbursement of living/medical/insurance expenses at an annualized rate of $125,000 per year paid on a biweekly basis.

"(B) Commission of 35 percent of the gross profit on your customers' sales over the base sales amount. Base sales for the purpose of this agreement are defined in the amount of $600,000. Commissions will be paid on sales in excess of $600,000 each year for the preceding company's fiscal period within 75 days of the end of that fiscal period.

"(C) Reimbursement of rent expense paid biweekly for the 5,000 square feet of space currently occupied at a current rent of $2,600 per month as long as it is deemed necessary by the company.

"(D) Reimbursement of the expense of a warehouse helper paid biweekly at the rate of $21,000 per year as it is deemed necessary by the company.

"(E) Reimbursement of pre-approved business-related travel expenses." (SRA dated June 11, 2000, p. 1.)

The SRA contained an integration clause, which provided that "[t]his agreement contains the entire agreement between the parties hereto and supercedes all prior agreements and understandings, oral or written, between the parties . . . ." (SRA dated June 11, 2000, p. 1.)

A similar SRA was executed by Mr. Dillon. Mr. Dillon's SRA was identical, in all material respects, to Ms. Cook's SRA.

As a result of the discussions and agreement between Dillon, Cook and S. Walter, it was agreed that Ms. Cook

and Mr. Dillon would run the West Coast operation of S. Walter. Accordingly, Ms. Cook and Mr. Dillon would receive a combined "base reimbursement" of $125,000 per year. (SRA dated June 11, 2000, p. 1.) Any combined sales in excess of $600,000, would entitle them to 35 percent of any sales over this amount. (SRA dated June 11, 2000, p. 1.) Ms. Cook and Mr. Dillon were also given an annual sales forecast of approximately $962,500 dollars. (Letter of S. Walter Packaging Corp. dated May 4, 2000, p. 3.) The $962,500 figure was derived from information given by Ms. Cook as to her previous year's (1999) sales of $592,500, as well as $370,000 in expected sales from Mr. Dillon, which was also compiled based on information he provided S. Walter Packaging. (N.T. dated 7/19/04, p. 118.)

In her first month, Ms. Cook booked orders totaling $313,000 the month of July 2000.[1] However, this was the largest amount and the totals dissipated considerably thereafter. (N.T. dated 7/19/04, p. 38.) In August, Ms. Cook's bookings dropped to $50,000, September $1,100. (Defendant's exhibit 22 "S. Walter Packaging Corp. bookings analysis".) In October, the numbers again rose slightly to $70,300, but again began to dissolve with $50,100 in November, followed by $16,000 in December. (Defendant's exhibit 22 "S. Walter Packaging Corp. bookings analysis".) Ms. Cook began 2001 with orders

---

1. Bookings are orders being taken, but not yet produced, shipped and invoiced to the customer. Where the "sales amount" represents all of those functions have taken place, the product has been produced and shipped and billed to the customer through the invoicing system. (N.T. dated 7/19/04, p. 108.) Not all bookings or orders result in sales. Orders can be cancelled, changed, altered or stopped for a variety of reasons. (N.T. dated 7/19/04, p. 109.)

of $988 in January followed by $0 for February. (Defendant's exhibit 22 "S. Walter Packaging Corp. bookings analysis".) Her total bookings for 2000 were $503,030 which were significantly short of her $962,500 projected sales forecast for this year. (Defendant's exhibit 22 "S. Walter Packaging Corp. bookings analysis".) In addition, Ms. Cook totaled $54,894 in bookings for the first seven months of 2001. (Defendant's exhibit 22 "S. Walter Packaging Corp. bookings analysis".)

In terms of actual sales, Ms. Cook's total annual sales for the six-month period remaining in 2000 was $353,000, which did not meet S. Walter's expectation of $600,000 in sales. (N.T. dated 7/19/04, p. 39.)

Mr. Dillon did not contribute at all to this amount. In fact, Mr. Dillon did not make any sales or bookings in either 2000 or 2001. (N.T. dated 7/19/04, p. 40.)

At the end of January 2001, Mr. Wilson went to California to meet with Ms. Cook and Mr. Dillon regarding their failure to achieve the sales forecast. (N.T. dated 7/19/04, p. 40.) In the follow-up letter to this meeting, Mr. Wilson informed Ms. Cook that, since she missed her sales forecast for the year 2000, S. Walter would be changing her draw from $125,000 to $84,000 and would no longer reimburse her for rent expenses. (Correspondence of S. Walter to Sherrie Cook dated 2/6/01.) The letter also informed Ms. Cook that her sales forecast for 2001 was reduced to $800,000 to make it more achievable and her draw account would be reviewed in July 2001. (Correspondence of S. Walter to Sherrie Cook dated 2/6/01.) In response to the letter, Ms. Cook objected to the reduction of her draw, but continued as a sales repre-

sentative for S. Walter under this reduced compensation. (Correspondence of Sherrie Cook dated 2/14/01.)

During the period from January 1, 2001 through July 2001, Ms. Cook's sales order number dropped off significantly and again fell substantially short of S. Walter's forecast. Specifically, for this time period, her sales orders totaled $55,000. (Defendant's exhibit 22 "S. Walter Packaging Corp. bookings analysis".) As a result, Mr. Wilson advised Ms. Cook by correspondence that she would not meet the $800,000 sales forecast stated in their agreement in February and that the lack of sales would create an $80,000 loss for S. Walter. (Correspondence of S. Walter dated July 2, 2001.) As of the date of S. Walter's letter, Ms. Cook was 49 percent behind her target sales forecast for the year to date. Consequently, S. Walter sustained a loss of $81,110 as of July 2, 2001. (Correspondence of S. Walter dated July 2, 2001.) Mr. Wilson also indicated that Ms. Cook would not make her $800,000 sales forecast for 2001 and that it was doubtful that her sales would even exceed $450,000, which is slightly more than half of sales forecast stated in S. Walter's letter of February 6, 2001. At that time, Mr. Wilson requested that Ms. Cook give some thought as to how they could unwind their business relationship amicably. (Correspondence of S. Walter dated July 2, 2001.)

By letter dated August 13, 2001, Ms. Cook notified S. Walter that she, Mr. Dillon and Accent were going to take the measures necessary to protect their interest. Ms. Cook stated that she would not continue her sales activity on S. Walter's behalf, thereby effectively ending her employment relationship with S. Walter. (Correspondence of Sherrie Cook dated 8/13/01.)

In February 28, 2002, Ms. Cook instituted this civil action by filing her complaint against S. Walter, Mr. Gettlin and Mr. Wilson. Plaintiff alleges, inter alia, that S. Walter's conduct by and through its officers, breached its contract with Ms. Cook. (Complaint dated 2/28/02, p. 10.)

This case proceeded to trial on July 16, 2004, wherein the jury returned a verdict in favor of plaintiff Sherrie Cook and against defendant S. Walter Packaging Corporation in the amount of $680,000 on July 21, 2004. Defendants filed their post-trial motions on July 30, 2004. On August 20, 2004, the trial court granted defendants' post-trial motion to set aside the verdict of July 21, 2004, and award a new trial. Plaintiff filed her notice of appeal and defendants cross-appealed. Defendants later withdrew their appeal. Plaintiff then filed her 1925(b) statement accordingly.

The sole issue whether the trial court committed an abuse of discretion or error of law in granting defendants' post-trial motions and awarding a new trial where the verdict of $680,000 for plaintiff was excessive and against the weight of evidence.

## III. LEGAL ANALYSIS

The decision to order a new trial is one that lies within the discretion of the trial court. *Coker v. S.M. Flickinger Co. Inc.,* 533 Pa. 441, 447, 625 A.2d 1181, 1184 (1993). In an assumpsit action, an appellate court will not reverse a court's exercise of discretion in granting or refusing to grant a new trial unless there has been a clear abuse of that discretion or that the verdict was against the weight of the evidence and resulted in a miscarriage of justice. *Spang & Co. v. United States Steel Corp.,* 519

Pa. 14, 24, 545 A.2d 861, 866 (1988). "To determine whether a trial court's decision to grant a new trial constituted a palpable abuse of discretion, an appellate court must examine the record and assess the weight of the evidence; not, however as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so doing plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury." *Id.* at 24, 545 A.2d at 865.

"This means that the trial court has considerable latitude within which to act, but there are also very specific limits to what it can do." *Coker,* 533 Pa. at 447, 625 A.2d at 1184. "The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, and discretionary power can only exist within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge." *Id.* "Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions." *Id.* at 447, 625 A.2d at 1184-85. "Discretion is abused when the course pursued represents not merely an error of judgement, but where the judgement is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Id.* at 447, 625 A.2d at 1185.

In ruling upon a motion for a new trial, "it is necessary to consider the entire record to determine whether the verdict was arbitrary or capricious or whether it was against the weight of the evidence, or whether there was clearly error of law or palpable abuse of discretion in the

rulings of the court below." *Gonzalez v. United States Steel Corp.,* 248 Pa. Super. 95, 108, 374 A.2d 1334, 1341 (1977). When considering whether the record supports the trial court's decision, the court generally defers to the trial court's judgment because, by virtue of its position, it is uniquely qualified to determine factual matters. *Coker,* 533 Pa. at 452, 625 A.2d at 1187.

"It is well established that one who suffers a loss due to breach of contract has a duty to make reasonable effort to mitigate her damages." *Delliponti v. DeAngelis,* 545 Pa. 434, 443, 681 A.2d 1261, 1265 (1996). "In an employment case, the measure of damages is the wages which were to be paid less any amount actually earned or which might have been earned through the exercise of reasonable diligence in seeking other similar employment." *Id.* The plaintiff, in an action for breach of contract, has the burden of proving damages resulting from the breach. *Spang,* 519 Pa. at 25, 545 A.2d at 866 (citing *Massachusetts Bonding & Ins. Co. v. Johnston & Harden Inc.,* 343 Pa. 270, 278-80, 22 A.2d 709, 714 (1941), and *East Texas Motor Freight, Diamond Division v. Lloyd,* 335 Pa. Super. 464, 473, 484 A.2d 797, 801 (1984)). "This burden can be established 'by proving that other substantially equivalent positions were available to [plaintiff] and that [she] failed to use reasonable diligence in attempting to secure those positions.'" *Delliponti v. DeAngelis,* 545 Pa. at 443, 681 A.2d at 1265.

The general measure of damages, applicable in cases of breach of contract, is to put the aggrieved party as nearly as possible in the same position as she would have occupied had there been no breach. *Murray v. University of Pennsylvania Hospital,* 340 Pa. Super. 401, 490

A.2d 839 (1985). However, damages are not recoverable if they are too speculative, vague or contingent and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty. Restatement (Second) of Contracts §352; Murray on Contracts §226. "Damages for lost profits, like other contract damages, may not be awarded when the evidence leaves the trier of fact without any guideposts except his or her own speculation." *Merion Spring Co. v. Muelles Hnos. Garcia Torres S.A.,* 315 Pa. Super. 469, 486, 462 A.2d 686, 695 (1983). Specific evidence must be introduced to permit a "reasonably certain" estimate of the amount lost due to the breach. *Id.* "To recover costs for a breach of contract, compensation is given only for those injuries that are a direct and foreseeable result of the breach." *Reimer v. Tien,* 356 Pa. Super. 192, 208, 514 A.2d 566, 575 (1986). In addition, courts have traditionally required greater certainty in the proof of damages for breach of a contract than in the proof of damages for a tort. Restatement (Second) of Contracts §352, comment (a).

Plaintiff takes the position that her annual salary of $125,000 was guaranteed whether or not she achieved her annual sales forecast. Assuming arguendo that the plaintiff was entitled to her annual salary of $125,000 for the term of her contract (five years), the maximum amount of recovery under the applicable contract theory of recovery of *Murray,* had plaintiff never been compensated, would have been $625,000. The law in *Delliponti* also states that we are required to then subtract any amount earned or compensation received under the contract, which was $113,000 in this case. (N.T. dated 7/20/

04, pp. 115-19.) This amount represents compensation Ms. Cook received from the beginning of her employment with S. Walter in June 2000 until her termination in August 2001. (N.T. dated 7/20/04, pp. 115-19.)[2] Thus, according to the calculation stated in *Delliponti,* the *maximum* amount of legally recoverable damages for Ms. Cook was $512,000.

However, "[i]t has long been the law in our Commonwealth that it is competent for the parties to a written contract to show that it was subsequently abandoned in whole or in part, modified, changed or a new one substituted, either by writings or by words or by conduct or by all three." *Trustees of First Presbyterian Church of Pittsburgh v. Oliver-Tyrone Corp.,* 248 Pa. Super. 470, 476, 375 A.2d 193, 196 (1977).

On February 6, 2001, Andy Wilson sent correspondence which confirmed an earlier meeting whereby S. Walter would reduce Ms. Cook's salary from $125,000 to $84,000 due to inadequate sales for 2000. (Correspondence of S. Walter Packaging dated 2/6/01.)

In addition, Mr. Wilson stated that S. Walter would no longer reimburse Ms. Cook for rent of their warehouse and office pursuant to their agreement of June 11, 2000. (Correspondence of S. Walter Packaging dated 2/6/01.)

2. Although this time period represents the time from which Ms. Cook was employed, her pay period was only 13 months during this period. For purposes of calculating the $113,000 credit, Ms. Cook received seven monthly payouts of $10,416.67 under her initial contract salary of $125,000 annually. Thereafter she received six monthly payouts of $6,680 under the modified contract salary of $84,000. The actual months she received compensation began in July 2000 until she received her final payment in July 2001. (N.T. dated 7/20/04, pp. 115-19.)

The contract of June 11, 2000, specifically states with respect to reimbursement for rental expenses that "[r]eimbursement of rent expense . . . as long as it is deemed necessary by the company [S. Walter]." (Sales representative agreement of 6/11/00, p. 2.) These terms confer discretionary power upon S. Walter to cease reimbursement of rental expense at any time during the contract period. S. Walter decided to exercise its right to discontinue its reimbursement of Ms. Cook's rental expense because S. Walter sustained a loss in 2000 after taking Ms. Cook's sales and subtracting the costs and expenses. (N.T. dated 7/19/04, pp. 109-10, defendant's exhibit 25 "S. Walter Packaging Corp./Accent International income statement.") According to exhibit 25, S. Walter sustained a loss of $5,676 in gross operating income for 2000 and cut the expenses in an attempt to minimize the losses sustained to S. Walter.[3]

In response to these modified terms, Ms. Cook replied with a written letter protesting the reduction in salary and stating she continued to operate under the new terms imposed by S. Walter instead of terminating her contract. (Correspondence of Sherrie Cook and Ralph Dillon dated 2/14/01.) Notice to terminate a contract must be clear and unambiguous. *Accu-Weather Inc. v. Prospect Communication Inc.,* 435 Pa. Super. 93, 100, 644 A.2d 1251, 1254 (1994). "Ambiguous conduct and language intended to signal contract termination will be deemed not to have terminated the contract." *Id.* In *Accu-Weather,*

---

3. This amount was computed by taking into account the gross operating figures from August 2000 to January 2001 listed in defendant's exhibit 25. July 2000 was not factored in arriving at this figure for the above-stated reasons. See n.2, *supra.*

our Superior Court held that the appellee did not properly terminate their contract because: (1) notice was ambiguous in that it failed to manifest a clear intent to terminate the agreement, and (2) appellee's subsequent performance under the agreement negated the notice of termination. *Id.* Ms. Cook's letter specifically states:

"I DO NOT wish to terminate this agreement. I wish to fulfill my contractual obligations. . . . I wish to resolve this situation as soon as possible. I wish to have my level of income reinstated immediately. Since I'm now in a precarious situation because of your actions of cutting my compensation[,] I will need a response to this letter within five days." (Correspondence of Sherrie Cook and Ralph Dillon dated 2/14/01 p. 2.)

Although Ms. Cook demanded a response within five days, she failed to receive any response from S. Walter regarding this letter and continued under the revised terms stated by S. Walter until August 2001. Ms. Cook's letter of February 14, 2001, does not amount to a clear and unambiguous termination of her initial (June 11, 2000) contract with S. Walter, rather her continued conduct of performing sales and collecting her new salary for $84,000 acts as an assent to the modifications proposed by S. Walter by letter dated February 6, 2001. Consequently, Ms. Cook's continued performance of sales, despite S. Walter's notification of her decrease in salary and cuts in reimbursement expenses, was sufficient to act as a modification to the initial contract of June 11, 2000. Under the circumstances, the modification was effective as of February 2001 and Ms. Cook continued her employment with S. Walter until August 2001, wherein her contract with S. Walter was terminated.

The amount recoverable under the modified terms of Ms. Cook's contract with S. Walter would entitle her to receive $247,160. This amount represents the monthly payment of $6,680 per month for the 37 months remaining for which Ms. Cook was not compensated.

In addition to the issue of what Ms. Cook was legally entitled to recover in expectation damages for her base compensation from the time of February 2001 until the end of the contract period, the jury was also responsible for determining whether the evidence presented clearly and convincingly proved Ms. Cook had the ability to achieve sales in excess of her $600,000 sales forecast in order to share in 35 percent of any profits over and above this amount.

The case of *Wilson v. Wernwag,* 217 Pa. 82, 66 A. 242 (1907), cites the principle that profits may be recovered as damages if the evidence is reasonably certain and definite to justify a jury's estimation of their extent.[4] In its analysis, the Pennsylvania Supreme Court in *Wilson v. Wernwag*[5] differentiated between recoverable profits, which are "direct and immediate fruits of the contract" and those "collateral profits," which are too uncertain, speculative and remote to allow recovery for. The court stated:

"Profits which would certainly have been realized but for the defendant's default are recoverable; *those which are speculative or contingent are not. . . . Indeed it is clear that whenever profits are rejected as an item of damages, it is because they are subject to too many con-*

---

4. *Id.* at 93-94, 66 A. at 246.
5. 217 Pa. 82, 93, 66 A. 242, 246 (1907).

*tingencies, and are too dependent upon the fluctuations of markets and the chances of business to constitute a safe criterion for an estimate of damages."* [6] (emphasis added)

The court used the further reasoning: "collateral profits are too remote to be considered in the measure of damages . . . 'But profits or advantages which are the direct and immediate fruits of the contract entered into between the parties, stand upon a different footing. These are part and parcel of the contract itself, entering into and constituting a portion of its very elements . . . .' " [7]

In order to award damages to plaintiff based on profits in excess of her $600,000 sales requirement would require the jury to speculate on several levels. First, the jury would have to surmise whether the plaintiff would have exceeded her $600,000 sales requirement, as well as, in which years Ms. Cook would have been able to achieve this goal, then they would have to determine how much in additional sales plaintiff would have made and how much that would have entitled her to be compensated for. All these decisions would have been made based solely on the testimony that Ms. Cook had $353,000 in sales six months into the first year of her contract with S. Walter. (N.T. dated 7/19/04, pp. 112-13.) Additionally, Ms. Cook testified that her sales with Accent the previous year of 1999 amounted to $592,500, which is below the $600,000 base sales needed before she was to join in 35 percent of any profits above that amount. (N.T. dated 7/20/04, p. 223.)

---

6. *Id.* (citing *Griffin v. Colber,* 69 Am. Dec. 718 (N.Y.)).
7. *Id.*

The uncertainty as to whether Ms. Cook could have ascertained the $600,000 base sales requirement and by how much is further highlighted by the vast fluctuation in her monthly sales for the year 2000. (Defendant's exhibit 6 "S. Walter Packaging Corp. sales analysis".) Specifically, the breakdown of Ms. Cook's sales numbers from July 2000 to December 2000 were as follows: August $48,414; September $9,531; October $120,626; November $68,167; December $106,457.[8] (Defendant's exhibit 6 "S. Walter Packaging Corp. sales analysis".) From January 2001 until August 2001, Ms. Cook accrued approximately $148,000 in sales, which is far less than the $600,000 base sales required before Ms. Cook could participate in S. Walter's profit-sharing. (N.T. dated 7/19/04, pp. 128-29.) In addition to the sales figures, Ms. Cook testified as to the cyclical nature of her sales industry given the seasons and how the Christmas holiday calls for significantly higher demand for custom boxes and bags. (N.T. dated 7/20/04, pp. 58-59.)

Taking these facts into consideration, any amount included in the jury's award which would have Ms. Cook achieving profit-sharing status in sales was against the weight of evidence. Plaintiff failed to present any evidence that achieving profit-sharing status was anything more than "collateral profits" which were too speculative and contingent upon market fluctuations. Therefore, any amount of recovery allocated to the prospect of Ms. Cook of achieving profit-sharing status with S. Walter

---

8. No "sales" were recorded for July 2000 because, at that time, orders were placed and manufacturing, shipping and billing of the product had yet to take place in order for the order to be transformed into sales. See n.1, *supra*. (N.T. dated 7/19/04, p. 108.)

in any year of her contract coupled with speculation as to the amount of profit-sharing she would have gained is inappropriate for the jury's consideration in their deliberation.

Based upon the above analysis, the jury's award of $680,000 is clearly against the weight of evidence presented at trial. Not only is this amount in excess of any recovery plaintiff is entitled according to contract law for expectation damages, but also any amount added based on the theory that she was entitled to profits for sales above her $600,000 sales forecast. Any portion of the jury's award which included Ms. Cook attaining profit-sharing status would be based on pure speculation and constitute "collateral profits," which are unrecoverable according to the law. Thus, the court did not commit an error of law or abuse its discretion in granting defendant's post-trial motions.

## IV. CONCLUSION

For the reasons stated above, this court respectfully requests the Superior Court to affirm the trial court's order of August 20, 2004, which granted defendants' post-trial motion to set aside the verdict of July 21, 2004, and award a new trial.